# Richmond.

## UNIVERSAL LIFE INS. CO. v. BINFORD AND ALS.

### January 12th, 1882.

1. INSURANCE COMPANIES—*Attachments.*—A New York insurance company was reported by the State insurance superintendent to the attorney-general as not in the condition required by law. Thereupon proceedings were started to dissolve the company and appoint a receiver. Soon after, each of eight Virginia policy-holders sued out his attachment and levied it on property of the company in Richmond, and each filed his bill, alleging that the company had become insolvent and would not be able to fulfill its contract when his policy matured, and praying for the enforcement of his lien.

HELD:

These attachments did not enure to the benefit of all the policy-holders, whether parties to the suits or not.

This case is unlike that of *Finney* v. *Bennett and als.*, 27 Gratt. 365, where the bank had ceased business and a "creditors' bill" had been filed to settle its affairs and distribute its assets.

2. IDEM—*Insolvency—Policy-holders.*—The company being insolvent when the bills were filed, complainants were entitled to recover; and no subsequent change in its condition, effected by other policy-holders, could defeat their recovery.

3. IDEM—*Measure of recovery.*—Each policy-holder is entitled to a sum of money which, on the day of the company's insolvency, would purchase from a solvent company a policy of the same kind, for the same amount and for the same rate of premium.

4. IDEM—*How ascertained.*—This sum is ascertained by treating the difference between the premiums paid the defendant company and the premiums to be paid the new insuring company, as an annuity for the assured's expectation of life, and calculating its cash value.

5. IDEM—*Evidence.*—The report of the State insurance superintendent having been, without objection, read as evidence in the court below, the failure to except there is tantamount to a waiver of objection here.

6. IDEM—*Unrenewable policies.*—Where policy-holder has died, or become uninsurable before the company's insolvency, what would be the value of the policy need not be, and is not, here determined.

7. IDEM—*Status in quo.*—Restoration to his former *status* is all the policy-holder can ask. He is not entitled to profit in addition. He cannot take the difference between the premium he has paid for a non-participating (inferior) policy and the premium to be paid for a participating (superior) policy as the basis of the calculation of the measure of his recovery.

HELD:
    In this respect the court below erred.

Appeal from decree of the chancery court of Richmond in eight suits consolidated and heard together. Charles T. Binford, John H. Greanor, William S. Donnan, Robert Stiles, William L. Cowardin, John Johns, Jr., W. D. Adams and J. H. Adams, respectively, were the plaintiffs, and the Universal Life Insurance Company of New York was the defendant. The bills alleged the insolvency of the defendant, and its inability to fulfill its contracts of insurance on the lives of the complainants at the times of their deaths respectively; that proceedings had been duly instituted in New York to deprive the company of its charter and wind up its affairs, and prayed for the enforcement of their several claims, for which an attachment had been sued out by each plaintiff against the defendant, as a non-resident, and levied on the Ballard House, in Richmond, as the property of the defendant, and the tenant, J. L. Carrington, was summoned as a garnishee to answer for debts due by him to the defendant. A motion to abate these attachments, on the ground that under the Virginia statute (Code of 1873, ch. 36, § 19), this company was a resident corporation, was decided by the chancery court in favor of the defendant, but on appeal this court reversed the decision. See *Cowardin and als.* v. *Universal Life Ins. Co.*, 32 Gratt. 445. After the filing of the bills in 1877, and before the decree of the court below, in March, 1880, here complained of, the

proceedings against the defendant in New York were suspended upon its getting other policy-holders and persons having death claims to reduce them to the extent of one-half, so as to bring its liabilities below its assets, and the New York court decreed on 29th October, 1878, that the defendant was solvent. The court below, however, considered that the insolvency of the defendant at the time the bills were filed had been established, and that that entitled the plaintiffs to recover, notwithstanding the subsequent change in the defendant's condition, and decreed the payment to the plaintiffs of the values of their respective policies out of funds realized from the property levied on, having ascertained those values by calculating the cash value of an annuity for the insured's expectation of life for a sum equal to the difference between the premiums paid the defendant and the premiums to be paid the new insuring company, but did not confine the calculations for its basis to the difference between the premiums paid the defendant and that to be paid to the new insuring company *for the same kind of policy.* From this decree the defendant appealed. The other facts are stated in the opinion of the court.

*Ould & Carrington,* for appellant.

1. It is not enough for the complainants to aver the insolvency of the company; they must aver and prove inability on its part when the policies fall due. See *King* v. *The Acc. Life Fund and Gen. Ass. Co.,* 91 E. C. L. p. 194; 2 Parsons on Con. ch. 3, p. 179; Vice Ch. James in Cook's case, 9 Eq. Cases L. R. p. 703; *The People* v. *The Security Life Ins. Co.,* in court of appeals of New York (not yet reported), and Holdich's case, 14 Eq. Ca. L. R. p. 72.

2. But the evidence does not prove the alleged insolvency, but the contrary. See deposition of Mr. Griffin.

3. The report of the State insurance superintendent of New York was not competent or satisfactory evidence, even had it been authenticated. Its use as evidence was objected to in the court below.

4. Even had the insolvency of the company at the institution of the suits been proven, yet it is undeniable that when the decree of March, 1880, was pronounced, the company was solvent and able to pay claims against it whenever they fell due, as was expressly affirmed by the New York decree of October 29, 1878. *In re* World's Safe Ins. Co., 40 Barb. 503, the court said: "I think it enough to prevent dissolution within the spirit of this act, if the assets are sufficient at the time of the hearing before the referee, instead of at the time when the application was presented. The object is security to the creditors of the company, and not its punishment for past offences."

5. Does attachment lie in any such case ? Assuming the company's insolvency, must not the assets be distributed *pro rata* among its creditors? See *Finney* v. *Bennett,* 27 Gratt. 365.

6. The chancery court erred in adopting its commissioner's mode of ascertaining the values of the policies of the complainants. That mode is unequal and unjust, and would destroy any company to which it might be applied. It is not the mode adopted by Vice-Chancellor James in 9 Eq. Ca. L. R. pp. 714, 716.

In *N. Y. Life Ins. Co.* v. *Statham,* 3 Otto, 24, the supreme court declared the equitable value of a policy to be "the difference between the cost of a new policy and the present value of the premiums yet to be paid on the forfeited policy when the forfeiture occurred."

7. If the mode of ascertainment were correct, yet there was error in taking as the basis of his calculation the premium charged on a policy of a very different kind from the complainant's policy. This is gross error.

*R. L. Maury, H. H. Marshall, Johns & Bloomsburg, Connor, Ro. Stiles, Wise & Cosby,* for appellees.

BURKS, J., delivered the opinion of the court.

In these causes (consolidated and heard as one cause), the principal questions in the determination of which all others raised may be considered, are: 1. Whether the complainants (appellees here) are entitled to relief? 2. If so, what is the nature and what the measure of that relief?

The claim to relief is based mainly on the alleged insolvency of the appellant (the Universal Life Insurance Company) at the time the bills were filed, and I am of opinion that the claim is sustained by the proofs. It is established by the report of the superintendent of insurance, the circulars and papers sent out by the company to the policyho'ders, the proceedings in the supreme court of New York, and other facts and circumstances shown in the record. It is objected that the report of the superintendent cannot be read as evidence for any purpose. I am of a different opinion. It was offered as evidence in the court below, and a diligent search through the record has not enabled me to find any exception to it in that court. It appears to have been first offered in connection with the deposition of Mr. Johns, and afterwards (in a different paper) on the cross-examination of Griffin. It was filed in the cause, and considered both by the commissioner and the chancellor. If it was designed to exclude it, specific exception should have been taken, so that the chancellor might have passed upon it. The failure to except is tantamount to a waiver of objection. This proposition has been affirmed by repeated decisions of this court. See *Simmons* v. *Simmons' Adm'r*, 33 Gratt. 451, and cases there cited. It is admitted in the petition for appeal that the report was before the New York court in the proceedings there had. Indeed, it

was the foundation of those proceedings. Though *ex parte*,. it was official in its character, and bears strong evidence of truth on its face. It finds the company insolvent—its liabilities being upwards of one million of dollars in excess of its assets—and details facts elicited by the investigation (not necessary to be gone into here) which brought about the insolvency, and were of such a character as to constrain the superintendent to declare that " the whole management and conduct of the company had been utterly reckless, and almost, if not entirely, criminal."

But without laying any great stress on the superintendent's report—indeed, excluding it altogether as evidence, except so far as it may be regarded as the basis of the proceedings in the New York court—there is enough besides to justify the conclusion of insolvency. The very scheme resorted to by the company after the proceedings were commenced implied existing insolvency. That plan was to get the policy-holders to release one-half of the amounts assured to them, so as to reduce the liabilities below the estimated value of the assets. The proceedings instituted looking to the appointment of a receiver and ultimately to the winding up of the affairs of the company were suspended, in order to give the company an opportunity of carrying out their scheme. The letters and circulars addressed to the policy-holders urging the proposed release are inconsistent with the notion of solvency. Current policies amounting to $15,622,804, and death-claims and matured endowments aggregating $600,397, were released by the holders to the extent of one-half, and these facts being made to appear, the court, by decree of October 29, 1878, adjudged the company to be solvent—not at the date of the proceedings, but then—at the date of the decree. Looking to the whole proceedings, the decree was in effect an adjudication that the company was *restored to solvency* by the releases of the policy-holders. It cannot be doubted, I think,

that but for the releases, insolvency, as at the commencement of the proceedings, would have been absolutely decreed and the company dissolved. This state of things gave the complainants the right to file their bills. They were no longer bound to pay accruing premiums to a company unable to fulfill its engagements, and they were entitled to compensation for the company's default.

It is contended that the adjudication of existing solvency by the New York court, rendered prior to the chancellor's decree, deprived the complainants of any right of recovery or title to relief, although the company may have been insolvent when the bills were filed. I cannot assent to this proposition. The rights of the complainants were fixed as at the time they brought their suits. They were then entitled to damages by reason of the insolvency then existing, and no subsequent change in the condition of the company, effected by the agency of other policy-holders, could defeat recovery upon a cause of action or title to relief good when the suits were instituted. Nor can I give my assent to the further proposition, contended for by the appellant's counsel, that the insolvency being assumed, the attachments levied enured to the benefit of all the policy-holders, whether parties to the suit or not. The company was not in actual liquidation, either voluntarily or under decree of court, nor was any one of the bills a creditor's bill in a technical sense—that is, a bill for the benefit of the complainant and other creditors, or for the general administration of the assets in equity; and therefore the case is unlike that of *Finney* v. *Bennett and others,* 27. Gratt. 365, cited by the counsel. Each creditor had the right to file, as he did, his separate bill for the enforcement of his own claim, and the several bills were consolidated (and properly) for the sake of convenience and to save costs; and I know of no adjudged case or principle of equity which sustains the proposition contended for.

The complainants being, in my judgment, entitled to relief on the case made, the only remaining question is, what is the nature of that relief and what its measure?

It is agreed, I believe, on all sides, that assuming the right of recovery each of the complainants is entitled to just such a sum of money as will place him where he would have stood if the Universal Life Insurance Company had continued solvent; in short, to such a sum as would restore substantially the *status in quo*. If there were a successor of that company, perfectly solvent, continuing the business on the same terms and conditions, and issuing policies of precisely the same character and description in every respect as its predecessor, the sum which would be required to be paid by each of the complainants to the succeeding company on the 17th day of July, 1877 (the date of the insolvency of the former company), to continue the old policy in force according to its tenor, as upon a new policy of that date, would seem to be the exact measure of recovery. The proposition may be stated in a more general form. Each policy-holder is entitled to a sum of money which, on the 17th day of July, 1877, would have purchased from a solvent company a policy of the same kind and description as the old, for the same amount and at the same rate of premium.

The principle is deducible from what was said by Vice-Chancellor James *in re* Albert Life Assurance Company (decided in 1870), Law Rep., 9 Eq. Cas. 716. Speaking of the measure of the loss or damage sustained, he says: "It is not that which you would have to pay to an assurance office selected by you (the policy-holder); it is not that which you would have to pay to an office selected by the Albert (the insolvent company); but it is that which you would have to pay to a substantial and solvent company with a substantial proprietary capital, something like that of the Albert, or other guarantee fund, having exactly, or

as nearly as possible, the same rates of assurance as the Albert had; because part of the security a man takes is the rate of assurance. If a man assures his life in an office that takes high premiums, he has got the security of the high premiums contributed by others. If he assures his life in a low premium office, he pays the lower premiums, and he has got the security of those lower premiums only. Therefore, what I say is, find me an office, if you can, whose rates of premium are substantially the same as the Albert— any office that has got a guarantee fund as substantial and as large as the Albert's—find me an office of that kind, that is, a company that has got a substantial business; satisfy me that it is so, and then find what money would be required to pay that office in each case to continue the liability of the Albert upon the existing policies at the same premiums. If that money be forthcoming, the policy-holder is not prejudiced at all. He goes there and gets exactly as good security; he is in the same position for all practical purposes as he would have been in if the Albert had continued business. * * * * * * * * If you can find an office of that kind, and you can give him a policy of exactly the same description, then he is neither better nor worse off than he was the day upon which the winding up took place. It appears to me, therefore, that as a jury, I should say that is the exact amount of damage I should give. If I failed to give a man a horse which I had contracted to sell him, if I could show that he would, for a certain sum of money, get exactly the same kind of horse, that is the amount of damage he has sustained."

The rule laid down by the vice-chancellor was approved and followed by the master of the rolls (Lord Remilly) in Holdich's case (decided in 1872), Law Rep., 14 Eq. case, 72, and though criticised and not approved by Lord Cairns in Lancaster's case (note to Holdich's case), yet it was not disapproved by him, as applied to a case in which there is no

·deterioration of the health of the assured between the date ·of the first insurance and the period at which the second is to be effected. For, after stating the rule adopted by Vice-Chancellor James, adverting to the sum required to be paid under that rule, he says: "Now, so far as that sum arises from the mere difference of age, introducing no other ingredient into the case, but taking, for instance, a person who was insured in the Albert at the age of twenty-five, and who is to be reinsured in this supposed company at the age of fifty, not looking at any difference in the state of health at one time or another, but merely looking at the difference of premium for a man of twenty-five and a man of fifty, so far as the decision was founded on these elements the decision would have supplied a not inaccurate mode of arriving at an estimate of the value of the policy. If there was nothing more, then I should have been willing to have followed that principle."

This concession is sufficient for the purposes of the case we are now dealing with; for, though one of the policy-holders died after the company became insolvent, I believe, and the life of another became uninsurable from a deterioration of health occurring after he took out his policy, in calculating the values of the policies of these two the same rule was applied as in the cases of the others, who were in a normal state of health, and any complaint here on that account from either side would come too late, because not made below by exception to the commissioner's report. Whether the rule was properly applied to these two policies, and, if not, what would be the proper principle for estimating their value, I do not deem it necessary to decide, and I express no opinion on that matter. See *People* v. *Security Life Ins. Co.*, 78 N. Y. 114, 126, 127; *Holdich's* case, *supra*.

The sums of money to which the complainants are respectively entitled, as reported by the commissioner under

the order of reference, are stated by him to be the sums in cash for which they could, on the 17th day of July, 1877, have severally taken out similar new policies for the same amounts, paying the same premium they were paying on those they held in the defendant company. These sums were ascertained by treating the difference between the premium paid the defendant company and what would have been required to be paid the new insuring company as an annuity for the insured's expectation of life and calculating its cash value. The premium assumed in the calculation for the new insurance was the rate charged by five companies named, all offering, as stated, to issue new policies at the same price.

The difference between the rates at the date of original insurance and the date of insolvency (if those rates are correctly assumed) expresses truly the sum which the insured would have to pay for new insurance annually for the residue of his life in addition to the rate of the old policy, and the cash value of that sum as an annuity for his expectation of life would be the sum to which he would be entitled in hand at the date of the insolvency—namely, the 17th day of July, 1877; for that sum would purchase a new policy of the same description as the old, and he would thus be secured as before, the additional cost being paid by the old company.

But the appellant's counsel contends that gross error was committed in the assumption by the commissioner of the rate of premium at the date of the insolvency; that the premium assumed was the premium charged on a policy very different in kind from the existing policy, the former being the premium on a policy paying dividends or participating in earnings or profits, and the latter a premium on a policy that paid no dividends, or was non-participating; that the former is much higher than the latter, and that the result of this error in the calculation is to make

the appellant pay for a policy of much greater value than the old.

The objection, I think, is substantially covered by the appellant's third exception to the commissioner's report; and, after much reflection, it appears to me that it is well founded. Certainly, indemnity or restoration, as nearly as may be to the former *status*, is all the complainants can ask. They are not entitled to profit in addition. They are entitled to as good security as they had before, and the appellant is bound to furnish it or the means to get it. It is not bound to furnish a better, or the means to procure a better. A policy drawing dividends or participating in earnings in a solvent company is accounted more valuable than one that does not participate in profits; the premium on the former is higher than the premium on the latter, and notwithstanding what is said on this subject in 9 Eq. Cases, *ubi supra,* I think this is an important element in estimating the value of policies. All that the Universal Life Insurance Company is bound to do is to furnish a new policy or a sum of money sufficient to buy one of the same description as the old. According to the rule, which has been stated, to ascertain that sum you must take the difference between the premium charged in the existing policy at its date, and the premium in any solvent company at the date of the insolvency of the first company on a policy of the same amount and of the same kind in every essential feature, and calculate the cash value of that difference according to the method pursued by the commissioner.

Now, as I understood the facts of this case, the premium rates of the five companies adopted by the commissioner in his calculations were the rates on dividend-paying or participating policies, and are much higher than the premiums charged on non-participating policies, such as the complainants hold. The extent of the error is measured by the difference in the two rates. The premium tables

of the five companies—the tables used by the commissioner—are before us, and the rates there shown, adopted by the commissioner, are premiums on policies which participate in profits, and they are the same in all five of the companies.

It is contended, however, by counsel for the appellees, that these rates were adopted as a basis of calculation by consent. If this contention were well founded, no question could be made on this branch of the case. But the learned counsel of the appellant denies that such consent was given—at least, to the extent claimed—and refers to the written agreement in the record as evidence of the only consent in regard to the matter. That agreement is very brief, and is in these words : "It is agreed by the counsel on both sides that the commissioner, in estimating the equitable value of the policies, may refer to the rates of insurance of existing solvent insurance companies, respectively, without filing the same." Now, it would seem from this agreement that the only object was to give the commissioner the liberty to examine the rates of *all* solvent companies, and to dispense with the necessity of putting the tables into the record. The writing certainly does not express or fairly imply any such consent as that contended for by the appellee's counsel. It is to this agreement, it is supposed, that the commissioner refers in his report.

There were probably other tables before the commissioner—certainly the tables of two other companies referred to by the witness Griffin and filed with his deposition, showing, as explained by him, premiums on policies similar to those held by the appellees, the premiums being nearly the same. It is hardly necessary to say that the small amounts for which most, if not all, of the policies held by the complainants were allowed to participate in profits could not be regarded as making them participating policies to any extent that would materially affect the question which has been discussed.

Upon the whole matter, I am of opinion that the learned chancellor below erred in so much of his decree as is based on the commissioner's report as to the values of the policies, and that the decree so far should be reversed and the cause remanded with directions to recommit so much of the report as relates to the values for further inquiry, and that said values be ascertained and determined in conformity with the principles which have been stated.

There are some other errors and mistakes alleged by appellant's counsel to exist in the calculations made. I have not deemed it necessary to look particularly into them. If there be any such, they can be corrected when the case goes again before the commissioner.

DECREE REVERSED.