COMMISSIONER OF INSURANCE *vs.* MASSACHUSETTS ACCIDENT
COMPANY.

Suffolk.  May 11, 1943. — September 15, 1943.

Present: FIELD, C.J., DONAHUE, QUA, DOLAN, & COX, JJ.

*Insurance Company*, Liquidation.  *Damages*, For breach of contract.
*Release. Assignment. Contract*, Construction, "Reinsurance Agree-
ment."

Holders of accident and health insurance policies issued by a Massachu-
setts company, upon a decree under § 180C, inserted in G. L. (Ter. Ed.)
c. 175 by St. 1939, c. 472, § 3, ordering liquidation because of the com-
pany's insolvency, whether their policies were cancellable or noncan-
cellable and whether they were disabled or not, had claims which were
not "contingent" as that word is used in the statute, but were provable
if the policies had value ascertainable in any reasonable way and if
they suffered loss of that value.
Determination of the value of a policy of accident or health insurance in a
liquidation of the insurance company under § 180C, inserted in G. L.
(Ter. Ed.) c. 175 by St. 1939, c. 472, § 3, should be as of the date of
the decree ordering the liquidation and as if ordinary liquidation had
then begun and had proceeded to completion without any reinsurance
agreement.
The proper method of determining the value of the insurance coverage of
noncancellable health and accident policies, issued by a Massachusetts
insurance company which had become insolvent and subjected to
liquidation under § 180C, inserted in G. L. (Ter. Ed.) c. 175 by St.
1939, c. 472, § 3, and held by persons not disabled, where it ap-
peared that there was no insurance obtainable in other companies
sufficiently similar in character to form a basis of comparison, was to
calculate, by sound actuarial methods and the aid of applicable stand-
ard life and mortuary tables, as of the date of the decree ordering liqui-
dation and as if there had been no insolvency, the present worth of the
total estimated benefit payments that such policyholders would have
received if their policies had continued in force, and to subtract there-
from the total present worth as of that date of the future gross premiums.
In the calculation of the reserve above described, it was proper on the
findings of a master to use three and one half per cent interest tables
instead of three per cent tables, and to assume that the rate at which
nondisabled policyholders would become disabled would remain con-
stant after they reached the age of sixty-five years.
Claims of disabled holders of policies of health and accident insurance
issued by a Massachusetts insurance company had no priority over

claims of nondisabled policyholders, or of creditors who were not policyholders, in liquidation of the company under § 180C, inserted in G. L. (Ter. Ed.) c. 175 by St. 1939, c. 472, § 3; § 46 of c. 175 was not applicable.

In liquidation of an insolvent Massachusetts insurance company under § 180C, inserted in G. L. (Ter. Ed.) c. 175 by St. 1939, c. 472, § 3, following rehabilitation proceedings under §§ 180A, 180B, the receiver was ordered to pay in full claims based on alleged losses occurring before the date of the decree for liquidation which he had contested but which after the decree had been adjudged valid, where it appeared that, acting under decrees entered before the decree for liquidation, he had paid in full other like claims without contesting them.

In the light of the broad general plan shown by the provisions of § 180C, inserted in G. L. (Ter. Ed.) c. 175 by St. 1939, c. 472, § 3, a proper construction of certain provisions of a reinsurance agreement made in a liquidation of an accident and health insurance company did not require that claims held on the date of the decree for liquidation by holders of noncancellable policies who later assented under the agreement should be excluded from consideration in determining the dividend on provable claims of nonassenters that should be paid by the receiver, but they should be included; in calculating that dividend, the assets of the company should be taken at their value on the date of the decree, before the reinsurance agreement became operative.

In calculating dividends on claims of nonassenting holders of noncancellable policies and of general creditors in a liquidation of an accident and health insurance company under § 180C, inserted in G. L. (Ter. Ed.) c. 175 by St. 1939, c. 472, § 3, the value of cancellable business of the company, together with its agency organization and good will as a going concern, should be included as an asset of the company as of the date of the decree for liquidation.

PETITION, filed in the Supreme Judicial Court for the county of Suffolk on February 2, 1940, by the commissioner of insurance, averring insolvency of the respondent and seeking its liquidation and other proceedings under § 180C, inserted in G. L. (Ter. Ed.) c. 175 by St. 1939, c. 472, § 3.

It appeared that a petition previously had been filed by the commissioner against the respondent on August 23, 1939, seeking rehabilitation proceedings under §§ 180A and 180B of the statute, and that thereunder on August 23, 1939, the commissioner had been appointed temporary receiver and on August 30, permanent receiver.

After reports by a master, the case was reserved by *Qua,* J., for determination by the full court.

*A. B. Casson,* (*C. W. Mulcahy* with him,) for the receiver.

*K. C. Parker,* for Union Mutual Life Insurance Company.

*C. Silbert & G. S. Hoag,* (*C. I. Petersen* with them,) for certain dissenting policyholders.

*I. Orleans* of New York, for Susan L. Stone, administratrix.

*E. N. Griswold & A. G. Carver,* by leave of court, submitted a brief as amici curiae.

QUA, J. The Massachusetts Accident Company, a domestic insurance company formerly doing an accident and health insurance business only, after having been the subject of a rehabilitation proceeding under G. L. (Ter. Ed.) c. 175, § 180B, as inserted by St. 1939, c. 472, § 3, and having later been adjudged insolvent, is now in process of liquidation by the commissioner of insurance as receiver appointed by this court for that purpose under the provisions of G. L. (Ter. Ed.) c. 175, § 180C, as inserted by St. 1939, c. 472, § 3. Various questions have arisen as to the allowance and priority of claims and the ascertainment of the assets of the company for the purpose of distribution. Issues of fact have been determined by a master whose original and supplemental reports have not yet been confirmed.

Section 180C provides in part that the commissioner as receiver "shall endeavor to obtain a proposal from a solvent company or companies to take over or assume the policies of the company [of which liquidation has been ordered] in whole or in part, or to take over or assume, on modified terms, the liabilities of the company to its policyholders, and shall submit to the court such proposal as he deems best for the interest of the policyholders." Accordingly the receiver sought and obtained from the Union Mutual Life Insurance Company, organized under the laws of Maine, a "Reinsurance and Management Agreement," hereinafter referred to as the Reinsurance Agreement or the agreement, which he was by decree of the court in this cause, dated February 23, 1940, authorized to execute, and which he did execute on that day. The questions before us are affected in various ways by the provisions of the Reinsurance Agreement to which we now refer in brief outline, leaving further details to be stated in connection with matters hereinafter discussed to which they particularly relate.

The Reinsurance Agreement is in two parts. Part I deals with the so called cancellable policies of the Massachusetts Accident Company, that is, those policies which were subject to cancellation by the company. This part of the accident company's business had been profitable. The Union Mutual reinsured these policies and assumed the full liability of the accident company upon them in consideration of (a) payment by the receiver to the Union Mutual of fifty-five per cent of the unearned premium reserve of those policies, taken at $56,421.80, (b) payment of the cash or its equivalent necessary for the liquidation of the accident company's liability for incurred and unpaid claims and unpaid claim expense, taken at $69,205.54, (c) payment of all premiums on cancellable policies, thereafter falling due and paid to the receiver or to the accident company and (d) the transfer to the Union Mutual of all the accident company's cancellable business and good will, including its policy contracts and agreements and all its books and records pertaining to said business. This part of the agreement provided full reinsurance without loss to all holders of cancellable policies in the accident company who did not within a specified time refuse in writing to accept the terms of the agreement, and was to become effective at once, and did become effective February 23, 1940, upon approval by the court and indorsement by the insurance commissioners of Massachusetts and of Maine. There was a provision by which policyholders assenting to Part I released the accident company and the receiver from all claims on their policies. Part II deals with the accident company's so called noncancellable policies, that is, policies which were not subject to cancellation by the company but could be kept alive as of right by the insured by the periodic payment of premiums until the insured reached a specified age, or for life, according to the terms of the particular policy. These policies had not been profitable, and the cost to the accident company of carrying out its contracts on this class of business had been the chief cause of its insolvency. Accordingly, the Union Mutual did not assume full liability upon these policies, but agreed, subject to certain

qualifications and conditions, to assume only certain fixed percentages of the accident company's liability for specified types of policies and claims. The receiver agreed to transfer to the Union Mutual all property of the accident company, except the sums already payable under Part I of the agreement, and except an amount sufficient in the receiver's judgment to liquidate all expenses of the receivership, including amounts that might be ordered by the court to be paid to dissenting policyholders and all other claimants in the liquidation proceedings. Any balance of the amount retained by the receiver which might remain after the liquidation should be completed was to be conveyed to the Union Mutual for credit to the "Non-can Fund" hereinafter described. The Union Mutual agreed to set up a fund, known as the "Non-can Fund," to consist of the property transferred or to be transferred to it by the receiver under Part II, of all future premiums to be received on noncancellable policies, and of certain further payments to be made into the fund by the Union Mutual. The "non-can" fund was to be debited with all payments that should be made by the Union Mutual in accordance with the agreement in respect of noncancellable policies. Provisions were included under which holders of noncancellable policies might elect whether to accept or to reject the benefit of the agreement, and Part II of the agreement was never to take effect if such a percentage of noncancellable policyholders (to be ascertained as provided in the agreement) should dissent as to impair the successful consummation of that part of the agreement. Provisions by which policyholders assenting to Part II released all claims on their policies or assigned them to the receiver will be the subject of later discussion.

There were about thirty-five thousand holders of cancellable policies and four thousand nine hundred sixty-six holders of noncancellable policies, exclusive of fourteen policies in dispute. Of these four thousand nine hundred sixty-six noncancellable policyholders, one hundred eighty-seven were disabled and entitled to benefits, and four thousand seven hundred seventy-nine were nondisabled, or as

they are sometimes called "active lives." Of the one hundred eighty-seven disabled policyholders, one hundred eighty-two (or ninety-seven and four tenths per cent) assented to the Reinsurance Agreement, and five (or two and six tenths per cent) elected not to assent. Of the four thousand seven hundred seventy-nine nondisabled policyholders, four thousand four hundred seventy-eight (or ninety-three and eight tenths per cent) assented to the agreement, and three hundred one (or six and two tenths per cent) elected not to assent. The percentage of assents being sufficient, Part II of the agreement went into effect on March 25, 1940. In accordance with Part II the receiver delivered to the Union Mutual for credit to the "non-can" fund cash and securities in the amount of $1,087,615.27 and retained in his own possession cash and other property in the amount of $520,344.44 to meet the claims of nonassenting policyholders and other claimants and the expenses of the receivership.

1. Preliminary to several of the other issues is the question raised by the receiver and others whether the claims of policyholders upon these accident and health policies are contingent claims and therefore not provable against the insolvent estate except subject to the conditions prescribed in § 180H hereinafter set forth. We are not here concerned with claims accrued and actually due and payable on February 23, 1940, the date when liquidation was finally ordered, for disability suffered before that date. Obviously such claims were not "contingent." See *Attorney General* v. *Equitable Accident Ins. Association*, 175 Mass. 196. We are here concerned with claims of policyholders who, because of the insolvency of the company, have lost the rights their policies would have given them of indemnity for disability which they might suffer after February 23, 1940. One paragraph of G. L. (Ter. Ed.) c. 175, § 180C, under which this liquidation is proceeding, reads, "The rights and liabilities of the company and of its creditors, except those holding contingent claims, and of its policyholders, stockholders or members, and of all other persons interested in its assets, shall, unless otherwise ordered by the court, be fixed as of the date of the decree ordering liquidation. The rights of claimants holding con-

tingent claims shall be determined as provided in sections one hundred and eighty G and one hundred and eighty H." Section 180G relates to claims of persons having causes of action against persons insured under liability policies and provides that under certain conditions such a claim may be proved against the insurance company, "regardless of the fact that such claim may be contingent." Section 180H reads, "Except as provided in section one hundred and eighty G, no contingent claim shall share in a distribution of the assets of an insurer which has been adjudicated to be insolvent by a decree made pursuant to section six or section one hundred and eighty C, except that such claims shall be considered, if properly presented, and may be allowed to share where (*a*) such claim becomes absolute against the insurer on or before the last day fixed by the court for filing of proofs of claim against the assets of such insurer, or (*b*) there is a surplus and the proceeding in which the decree was made is thereafter conducted upon the basis that such insurer is solvent."

In our opinion the policyholders in general have claims which are in their nature provable and which are not "contingent" as that word is used in the statute for any loss of future rights under their policies which they may have sustained in consequence of the insolvency of the company. It is true that the nondisabled policyholders might never become disabled, and that those already disabled before February 23, 1940, might not continue disabled or might die and so cease to become entitled to benefits. Whether the nondisabled policyholders would ever receive benefits, and whether the disabled policyholders would continue to receive benefits was therefore uncertain on February 23, 1940. Nevertheless both classes of policyholders had contracts under which they were entitled to insurance protection, and those contracts, or at least some classes of them, must have had value. The policyholders have been deprived of their contracts by liquidation of the company. In effect the company has completely broken its contracts of insurance with its policyholders and is no longer accepting their premiums and giving them protection. Upon the

final decree for liquidation, claims for damages therefore arose in favor of the policyholders against the company. These claims may be unliquidated, and the measure of damages may be difficult of ascertainment, but the claims are absolute and not conditional. They are not "contingent." They would not, it would seem, be increased if disability began or continued after February 23, 1940.[1] Indeed, it would seem that a large, if not the largest, interest in almost any insurance company must be that of policyholders who have not yet suffered loss, and that the solvency of the company and whether it should be allowed to continue business should depend upon its probable ability to meet the future claims of such policyholders. It would be an anomaly if an adjudication of insolvency should itself have the effect of restoring the company to a sort of solvency through the immediate elimination of one of the principal blocks of its liabilities.[2]

In *Carr* v. *Hamilton*, 129 U. S. 252, at page 256, the court said, "By that act [going into liquidation] the company becomes *civiliter mortuus*, its business is brought to an absolute end, and the policy holders become creditors to an amount equal to the equitable value of their respective policies, and entitled to participate *pro rata* in its assets." The great weight of authority supports this view. *Fuller* v. *Wright*, 147 Ga. 70, 72. *Shloss* v. *Metropolitan Surety Co.* 149 Iowa, 382, 384. *Casteel* v. *Kentucky Home Life Ins. Co.* 258 Ky. 304, 308. *People* v. *Palmer*, 363 Ill. 499, 508. *American Casualty Ins. Co.'s Case*, 82 Md. 535, 570. *Dean & Son's Appeal*, 98 Penn. St. 101. *Commonwealth* v. *American Life Ins. Co.* 162 Penn. St. 586. *People* v. *Security Life Ins. & Annuity Co.* 78 N. Y. 114, 124, 125. *People* v. *Commercial Alliance Life Ins. Co.* 154 N. Y. 95, 99. *Davis* v.

---

[1] *Commonwealth* v. *Massachusetts Mutual Fire Ins. Co.* 119 Mass. 45, 51. *Merrill* v. *Commonwealth Mutual Fire Ins. Co.* 171 Mass. 81. *Attorney General* v. *Equitable Accident Ins. Association*, 175 Mass. 196. *Shloss* v. *Metropolitan Surety Co.* 149 Iowa, 382, 384. *People* v. *Commercial Alliance Life Ins. Co.* 154 N. Y. 95. *Dean & Son's Appeal*, 98 Penn. St. 101. But it is held otherwise as to claims for instalments of rent accruing after the receivership. *International Paper Co.* v. *Priscilla Co.* 281 Mass. 22, 36.

[2] It is true that § 180H provides for the possible case of a "surplus," but it is not believed that this was expected to be a usual and normal event in liquidation.

*Amra Grotto M. O. V. P. E. R. Inc.* 169 Tenn. 564. *Lucas* v. *Pittsburgh Life & Trust Co.* 137 Va. 255, 271, 272. *Hobbs* v. *Occidental Life Ins. Co.* 87 Fed. (2d) 380, 384. Couch on Insurance, § 2043. See Williston on Contracts (Rev. ed.) §§ 1330, 1330A; Am. Law Inst. Restatement: Contracts, § 332. It is true that most of the decided cases deal with life insurance policies, and that such policies differ in some respects, particularly in respect to the certainty of loss at some time, from policies in which the loss insured against is disability, but nevertheless the principle seems applicable to any form of insurance where a receivership interrupts the coverage, and where the policy has a then present value capable of ascertainment in some reasonable manner.

Our view that the claims of policyholders who have not yet suffered loss are not contingent claims within the meaning of § 180H is strengthened by the language already quoted from § 180C wherein the phrase "except those holding contingent claims" seems to qualify the preceding word "creditors" and to have been intentionally so placed that it would not qualify the following words "policyholders, stockholders or members" and "all other persons interested in its assets," thus singling out "creditors" whose claims are contingent as distinguished from "policyholders" and others as the "claimants holding contingent claims" whose rights are to be determined as provided in §§ 180G and 180H. Some light as to the classes of claims that are regarded as contingent may also be derived from § 180G where causes of action by persons not parties to the insurance against persons insured under liability policies are referred to as possibly contingent. Such claimants have no direct contract relation with the insurance company and have lost nothing unless they succeed in establishing in some manner the liability to them of the persons insured. Their claims may well be regarded as "contingent." Compare *Matter of Empire State Surety Co.* 214 N. Y. 553, where the claimants were policyholders.

Our attention has been called to decisions holding under varying circumstances that claims for future instalments of

rent under a lease are not provable in certain forms of insolvency or bankruptcy proceedings. *Cotting* v. *Hooper, Lewis & Co. Inc.* 220 Mass. 273. *Deane* v. *Caldwell,* 127 Mass. 242. *Towle* v. *Commissioner of Banks,* 246 Mass. 161. *L. P. Hollander Co. Inc., petitioner,* 301 Mass. 278, 280. *Commissioner of Insurance* v. *Massachusetts Accident Co.* 310 Mass. 769, 772. These cases, we think, are distinguishable either in the terms of the controlling statutes or because of the difference between the contractual relationship of the lessor to his lessee in these cases and that existing between an insurance company and its policyholders who hold policies which as a result of past payments of premiums by them have accumulated an ascertainable present value of which they are deprived by the insolvency. See *Brown* v. *O'Keefe,* 300 U. S. 598, 605. Also a claim against a surety company on a bond, where insolvency intervenes before default in performance of the condition, may differ from the claim of a policyholder and has been regarded as contingent. *People* v. *Metropolitan Surety Co.* 205 N. Y. 135. *Matter of Lexington Surety & Indemnity Co.* 272 N. Y. 210. *Matter of Southern Surety Co. of New York,* 251 App. Div. (N. Y.) 360, affirmed, 276 N. Y. 537. See *Goding* v. *Roscenthal,* 180 Mass. 43; *Dunbar* v. *Dunbar,* 180 Mass. 170, affirmed, 190 U. S. 340; *Maynard* v. *Elliott,* 283 U. S. 273. In these cases the attempt has been to prove a claim for a loss occurring after the insolvency, and the question whether a claim could have been proved for the value of the contract of indemnity before loss, if there is any way of ascertaining such value, seems not to have been involved.

We conclude that all policyholders who were such on February 23, 1940, the date of the decree fixing the rights and liabilities of the company and of its noncontingent creditors, whether such policyholders were then disabled or not, and whether they had cancellable or noncancellable policies, held noncontingent claims for loss of their contracts, which claims were provable in their nature, if their policies then had value ascertainable in any reasonable way, and if they have suffered loss of that value. In a "straight liquidation" proceeding, unaffected by any reinsurance agreement,

each such policyholder would be entitled actually to prove his claim against the assets of the company. The effect of the Reinsurance Agreement in this case will be considered later.

2. We come next to the problem of ascertaining the value of the policies for the purpose of fixing the amounts of the policyholders' claims against the company.

Throughout the discussion of this matter and of other matters hereinafter dealt with it must be kept in mind that § 180C provides that the rights and liabilities of the company and of its policyholders and of all other persons interested in its assets shall, unless otherwise ordered by the court, be fixed as of the date of the decree ordering liquidation. The wording of that section makes it clear that that date may be, and seemingly is expected to be, prior to the negotiation and approval of any reinsurance agreement. (See second paragraph of § 180C.) Although in this instance the date was fixed by the decree of February 23, 1940, as of that day, and the Reinsurance Agreement was authorized by the same decree, we think it was the legislative design that the distributive shares to which claimants, who, having by the terms of the agreement a right of election, choose to rely upon their rights in liquidation rather than to accept any agreement modifying those rights, might become entitled should be determined as if ordinary liquidation had begun on the date fixed and had proceeded to the end without any reinsurance agreement. See *Doty* v. *Love*, 295 U. S. 64; *Neblett* v. *Carpenter*, 305 U. S. 297, 303–305. In this way, if a reinsurance agreement is in fact negotiated and approved by the court, policyholders having a right of election may accept its benefits if they see fit, but if they do not see fit, or if no agreement is negotiated and approved, their rights will be determined as in ordinary liquidation without regard to reinsurance. It follows for this and other reasons that the terms of the Reinsurance Agreement are not available as a measure of the rights of nonassenting policyholders. Moreover, the Reinsurance Agreement was the result of a bargain with a different company (the Union Mutual) and contains provisions entirely foreign to the original poli-

cies, and the calculations embodied in it are not ipso facto applicable in ascertaining the amounts for which nonassenting policyholders can prove.

It is obviously wholly impracticable to attempt to determine, with respect to the particular state of health and circumstances of each policyholder, the probability of his becoming disabled at some future time or, if he is already disabled, the probability of his continuing to live and to remain in that condition. No one interested in the case advocates such a method of valuing claims. Some conventional method of estimating chances on principles of average experience similar to those on which insurance risks are always calculated must be sought. See *People* v. *Security Life Ins. & Annuity Co.* 78 N. Y. 114, 126, 127.

In the record before us and in the briefs little is said about the possible claims of the approximately thirty-five thousand holders of cancellable policies. Probably this is because of the cancellable element in their policies and because by assenting to the Reinsurance Agreement they became fully reinsured and suffered no loss. Possibly all have assented to the agreement. At any rate it does not appear that any have sought to prove claims. No argument has been made as to their rights, and we do not attempt to determine whether, if they did not assent to the agreement, they could have established any such actual damage as to entitle them to prove claims.

The valuation of the claims of holders of noncancellable policies presents difficulty. These policies were worth more to the policyholder not only because their terms were advantageous to him and disadvantageous to the company and they could not be cancelled but also because of the level premium feature, as a result of which premiums paid in earlier years when the risk was smaller helped to carry the policy through later years when the risk became greater, thereby building up an "equity" in the policy. See *New York Life Ins. Co.* v. *Statham*, 93 U. S. 24, 30. This is fully explained in *Massachusetts Protective Association, Inc.* v. *United States*, 114 Fed. (2d) 304, at pages 309–310. Some of the nonassenting claimants under noncancellable policies

contend that the measure of their damages should be the
difference between the present value of the cost to the policy-
holder of going on with his policy in the accident company
and the higher present value of the cost to the policyholder
of an equivalent policy in a solvent company. The sub-
stance of this rule has been stated or applied, with some
differences of detail, in a number of decisions. See, for
example, *In re Albert Life Assurance Co.* L. R. 9 Eq. 706;
*In re English Assurance Co.* L. R. 14 Eq. 72. *Attorney
General* v. *North American Life Ins. Co.* 82 N. Y. 172, 188.
*Universal Life Ins. Co.* v. *Binford*, 76 Va. 103, 114. *Guggen-
heim* v. *Rasquin*, 110 Fed. (2d) 371, 372, 373. But whether
or not this would commonly be the best measure of value,
it cannot be applied in this case, since the master finds that
no other insurance company writes "the same coverage as
that of the Massachusetts Accident Company." No equiv-
alent insurance was obtainable on February 23, 1940. And
we think that the master's findings fall far short of disclos-
ing that other insurance was obtainable so nearly like the
policies of the Massachusetts Accident Company that the
cost of such other insurance can be used either as an approxi-
mate measure of the loss or as a step in estimating the loss.
The accident company itself wrote nineteen kinds of non-
cancellable policies, differing more or less from each other
in such respects as the age to which they were renewable
(some being for life), the conditions, times, and amounts of
total and partial disability payments, the "waiting periods,"
if any, and in other respects, and there were four classifica-
tions of risks according to the occupation of the insured.
The premiums varied greatly in different forms of policies.
Policies in other companies which it has been contended
were comparable differed from those in the accident com-
pany and from each other in respect to these and other
important matters. None is shown to be sufficiently simi-
lar to afford a fair basis of comparison. And when there
were in fact no comparable policies to which resort can be
had in assessing damages, we ought not to undertake to
construct such policies synthetically on the theory that
resort could have been had to them if they had existed.

The fact that they did not exist should govern, and the method of assessing the values of the policies by the cost of other policies should be rejected.

In this case as in many others the law must adopt a rule of damages which can be applied generally without undue difficulty and which will approach the theoretically perfect method as closely as circumstances will allow. In our opinion the plan proposed by the receiver in general fulfills these conditions. He contends that the value of the insurance coverage of the noncancellable policies held by persons not disabled on February 23, 1940, is the present value as of that day of the benefits that would have been payable to their holders if there had been no insolvency, less the present value as of that day of the gross premiums which would have become payable upon the policies, but which, because of the insolvency, need not now be paid. In order to carry this plan into effect he has calculated a so called "reserve" representing the company's total "liability" on these policies, amounting in all to $2,525,557, and consisting of two items, an "unearned premiums" reserve of $162,200.39, which we understand represents pro rata unearned premiums, and a further sum of $2,363,356.61, designated "Additional Active Lives (Non-Disabled) Reserve," which represents the accumulation of value that ought to be in the policies because of the level premiums. This Additional Active Lives Reserve was calculated from the actual experience of the accident company in writing noncancellable policies between 1915 and 1938 (which the master found to be sufficiently broad for this purpose), with the aid of standard disabled life and mortality tables. If correctly calculated and actuarially sound, this Additional Active Lives Reserve would represent a sum sufficient so far as actual losses are concerned (i.e. disregarding operating expenses) to carry the noncancellable policies of nondisabled policyholders from February 23, 1940, to full completion. It would be the net present worth of the future benefits to be anticipated from the policies. It would be a sum which a solvent company would actually possess and would include in the investments appearing on the

asset side of its statement of condition, and which would appear on the liability side in its reserves. It would be capable of being allocated fairly and proportionately to each particular policy. The portion allocated to each policy would, on the theory of damages we are now considering, fairly represent the value in liquidation of the policy on February 23, 1940, and would be the sum for which the nondisabled holder of a noncancellable policy could prove. The pro rata unearned premium reserve of $162,200.39 is not used in this theory of estimating policy value, since the policies are not to be treated as cancelled, surrendered or rescinded on February 23, 1940, and since, as we understand the master's report, that sum represents nothing that could ever have come back to the policyholders if the policies had run their full course, all that the policyholders could have received being comprised in the Additional Active Lives Reserve of $2,363,356.61, if that reserve has been calculated as the master finds it was. It is just possible that we have misunderstood in this respect what the master intended to find, since in one or two places, in referring to active life reserves, he has mentioned the larger figure of $2,525,557, which is the sum of the pro rata unearned premium reserve and the Additional Active Lives Reserve. The question as to what figure should be used, if there is a question, is left open to be determined in any proper manner when the case comes before the single justice for the entry of the decree hereinafter ordered. The figure to be taken is one which represents the present worth as of February 23, 1940, of the total estimated benefit payments that the policyholders would have received if their policies had continued in force, less the total present worth as of that day of the future gross premiums. Calculated reserves have been taken as a measure of policy value in a number of decisions. See, for example, *People* v. *Security Life Ins. & Annuity Co.* 78 N. Y. 114, 126, 127; *American Casualty Ins. Co.'s Case*, 82 Md. 535, 570; *Shloss* v. *Metropolitan Surety Co.* 149 Iowa, 382, 384; *Commonwealth* v. *American Life Ins. Co.* 162 Penn. St. 586, 589, 599; *State* v. *Surety Corp. of America*, 19 Del. Ch. 17.

But it is contended by claimants that the Additional Active Lives Reserve is not correctly calculated and actuarily sound in several particulars which it now becomes necessary to examine (paragraphs designated a to e below).

(a) It is contended that in calculating that "reserve" the present value of future net premiums instead of the present value of future gross premiums should be deducted from the present value of future expected benefits. The difference between gross and net premiums is the "loading," and it is argued in substance that the receiver's method of calculation leaves the loading with the company, and that if policyholders sought reinsurance in other companies they would have to pay loading on their new policies. But we think that since damages cannot be assessed on the basis of unobtainable comparable policies, the measure adopted must simply be that which will as nearly as possible put the policyholders in as good financial position as they would have been in if there had been no breach. *John Hetherington & Sons, Ltd.* v. *William Firth Co.* 210 Mass. 8, 21. *Bucholz* v. *Green Bros. Co.* 272 Mass. 49, 54. This can be done most consistently by allowing the claimants what they would have got out of their contracts less what it would have cost them to get it. What they would have got would not have been affected by the expense to the company of doing business, and the cost to them would have been the gross premiums. We think that gross premiums were rightly used in the calculation. The "reserve" thus calculated would be sufficient, so far as the premium element used in calculating it is concerned, to pay them what they would be entitled to receive. It is therefore, so far as this element is concerned, a proper "reserve" to set up on the "liability" side in stating the company's condition.

(b) It is contended that three per cent interest tables ought to have been used instead of the three and one half per cent tables that were actually used. The master found that three and one half per cent is a standard rate which has been in use for many years; that three per cent "is coming into more common use now that there has been a shrinkage in interest earnings"; that it is "an open ques-

tion" which rate should be used in the instant case; and "on all the evidence" that the use of the three and one half per cent tables was "reasonable." This seems to be a finding based upon evidence that good insurance practice supports the use of the three and one half per cent tables, at least in the circumstances of this case. We are hardly in a position to say that the finding is wrong. General Laws (Ter. Ed.) c. 175, § 9, Second, even after amendment by St. 1941, c. 326, § 1, still requires the three and one half per cent rate in computing the reserves of life companies, unless the company elects a lower rate.

(c) The receiver states in his brief that some of the claimants contend that a so called "1937 Standard Annuity Table" ought to have been used in computing the Additional Active Lives Reserve. If this contention is still made, it is disposed of by the further finding that this table is "wholly inappropriate" for any such group as the policyholders of the accident company because it is based on experience of life insurance companies with annuitants as to whom as a class there is "a terrific selection against the company in the matter of longevity."

(d) It is further contended that the Additional Active Lives Reserve, as computed by the receiver, is inadequate because it assumes renewability of the policies only to age sixty (or for five years in cases of policyholders over fifty-five), whereas some of the policies were renewable for life. Concededly this is a defect in the calculation which should be remedied if possible, but the master finds that there are no reliable actuarial tables from which the rate at which nondisabled policyholders over sixty-five years of age will become disabled can be computed. The rate of becoming disabled increases with age, but since the coverage extends only to disability to perform duties pertaining to an occupation or business, and since the number of policyholders engaged in gainful occupations decreases with age, the rate of compensable disability might not increase after age sixty-five. The master finds, however, that an assumption that the rate of becoming disabled would remain constant after age sixty-five "would be favorable to the respondent com-

pany, inasmuch as the probabilities are that the rate of becoming disabled and the rate of payment of benefits would not decrease after sixty-five years of age, and might increase." We interpret this as a finding that, on the weight of evidence before the master, "an assumption" that the rate of becoming disabled would remain constant after age sixty-five would not be too favorable to the nondisabled holders of noncancellable policies, although it might not be favorable enough to them. We must assume that the finding was supported by evidence. It follows that these policy-holders are entitled to the benefit of the finding on the theory that they have proved their claims to that extent, even if they have been unable to carry the proof further. The Additional Active Lives Reserve must therefore be recalculated on the basis that the rate at which nondisabled policyholders will become disabled remains constant after they reach the age of sixty-five.

(e) In one of the briefs the suggestion is made that the Additional Active Lives Reserve should be further corrected by making an allowance in computing the present value of premiums for "waiver-of-premium during disability" riders or for other riders on some of the policies. The record furnishes no basis for any correction in this respect. Moreover, on the master's findings it must be assumed that any pertinent riders have already been taken into account in calculating "the present value of the gross premiums expected to be paid in the future" which was deducted from the present value of the expected benefits in computing the Additional Active Lives Reserve.

We next turn to the disabled claimants holding noncancellable policies. The master finds that the receiver has calculated a claim "reserve" for claimants of this class amounting to $2,431,252. He finds "on all the evidence" that the computation of this reserve "was made in accordance with sound insurance practice, and that said reserve was reasonable." No attack has been made upon this "reserve," and it must be taken as a proper item of "liability" against the claims of disabled noncancellable policyholders from which the provable amounts of their claims may be

ascertained in accordance with principles hereinbefore discussed. It is, however, subject to correction if a few claims that were in dispute or in litigation when this reserve was calculated should ultimately be established for different amounts than those assigned to them in the calculation.

3. Questions of priority have arisen. In the absence of a statute we see no reason why the claim of a disabled policyholder in a company of this kind should have priority over the claim of a nondisabled policyholder or over that of an ordinary creditor who is not a policyholder. All are creditors of the company having provable claims, and upon general principles they should share in its assets pari passu. The authorities are to that effect. *Boyd* v. *Wright*, 148 Ga. 216. *Relfe* v. *Columbia Life Ins. Co.* 76 Mo. 594. *People* v. *Security Life Ins. & Annuity Co.* 78 N. Y. 114, 128–129. *Commonwealth* v. *American Life Ins. Co.* 170 Penn. St. 170. *In re International Life Assurance Society*, L. R. 5 Ch. 424. See cases collected in 1 Am. L. R. 598. Compare *Attorney General* v. *Massachusetts Benefit Life Association*, 171 Mass. 193, and *Attorney General* v. *American Legion of Honor*, 206 Mass. 131, 138, dealing with fraternal benefit orders.

But our attention is called to a statute. General Laws (Ter. Ed.) c. 175, § 46, provides that "When any domestic company becomes insolvent . . . claims for unpaid losses under its policies, other than life or endowment policies or annuity or pure endowment contracts, shall, in the distribution of its assets, whether liquidation is effected by a receiver or otherwise, be deemed and treated as preferred over claims for return premiums on cancelled or unexpired policies." Whether or not the claims for the future of holders of noncancellable policies who were already disabled on February 23, 1940, are "claims for unpaid losses," as it is said they are customarily considered to be in insurance practice, we are of opinion that claims of nondisabled holders of such policies are not "claims for return premiums." For reasons already stated we hold that these claims are to be proved on the theory of damages recoverable for the loss of the policies and that they are to be assessed at the present worth of the probable future benefits that would have been derived

from the policies if they had not been brought to an end by insolvency, less the present worth of future premiums. These damages so assessed in respect to noncancellable policies are not the same as premiums paid and are not any pro rata part of premiums paid. It is not perceived how the claims of policyholders who are entitled to prove for their full damages assessed on the theory that their policies would have continued in full force to the end are claims for "return premiums." We therefore conclude that disabled policyholders have no priority over nondisabled policyholders or over creditors who are not policyholders.

There are, however, a few claims of policyholders which we think entitled to priority. From the first appointment of the receiver on August 23, 1939, until the decree of February 23, 1940, the receiver continued to pay in full in the due course of business the losses as they accrued on policies. He did this under the authority of decrees of the court which permitted the continued payment of losses in order to preserve the business and its organization for rehabilitation or for transfer in the event of reinsurance and to prevent the business from disintegrating. When the receiver took over, some claims for accrued losses actually sustained were unpaid and were disputed by the company. The receiver continued to contest these claims until after February 23, 1940, and did not pay them, although all similar claims not in dispute were paid. Some of these claims have since been or may be established through proper proceedings, among them being a claim of Susan L. Stone, administratrix of the estate of Peter Stone, which has now been reduced to judgment in New Jersey and the amount of which is not now in dispute. Although the receiver may have been justified in contesting these claims, there is a certain lack of equity in a receiver paying in full the great bulk of claims of certain types from property in the custody of the court on the ground that such payment is a measure of preservation of the estate and at the same time refusing to pay a few other claims of the same kind to which the same reason was applicable and which would have been paid in full if the receiver had not been unsuccessfully contesting

them. The court should seek to prevent such discrimination in dealing with the assets in its hands. The receiver should now pay in full such disputed claims, whether they accrued before or after the appointment of the receiver, in so far as it has been or shall be finally established that they actually accrued and became due and payable before February 23, 1940, and in so far as they are of the same type in respect to their effect upon the continuity of the business as claims which the receiver has paid under the authority of the court for the preservation of the estate. See *Antoine* v. *James E. Nelson Co.* 265 Mass. 214, 218. This includes the Stone claim up to the amount of the judgment. *Attorney General* v. *American Legion of Honor*, 196 Mass. 151.

4. It is contended by certain claimants who have not assented to the Reinsurance Agreement that the claims held on February 23, 1940, by holders of noncancellable policies who later did assent should be entirely ignored or excluded from consideration in determining the proportion of the provable claims of nonassenters that should be paid by the receiver. If this contention were adopted the result would be that the nonassenters would be paid one hundred per cent of their proved claims, and the sum ultimately to be paid over to the Union Mutual to add to the "non-can" fund for the benefit of those who did assent would be correspondingly reduced, thus giving the nonassenters an advantage over the assenters and much more than they would have received if the company had been liquidated immediately without any attempt at salvage through the Reinsurance Agreement. This contention allows little or no weight to the broad general plan of § 180C, to which attention has already been called, that the rights and liabilities of the company and of its creditors, policyholders, stockholders and members, and of all other persons interested in its assets should, unless otherwise ordered by the court, be fixed as of the date of the decree ordering liquidation, and it overlooks the provisions to the same effect in the decree of February 23, 1940, that the rights and liabilities of the company and of its creditors, policyholders, stockholders, and of all other persons interested in its assets should be

fixed as of the close of business on February 23, 1940. As of the close of business on February 23, 1940, the Reinsurance Agreement had not gone into effect at all so far as concerned the noncancellable policies and might never go into effect with reference to those policies. At that time all the holders of noncancellable policies, both those who later assented to the agreement and those who did not assent, had claims of equal standing and were entitled to share in equal proportion in the distribution of available assets. No one concerned in the making of the Reinsurance Agreement — the Legislature in providing statutory sanction for such agreement, the receiver or the Union Mutual in negotiating the agreement, or this court in accepting it by the decree of February 23, 1940, as "the best proposal in the interest of the policyholders . . . which can be obtained" — could possibly have intended to hold out an inducement to policyholders to refuse their assent, and thereby to imperil the adoption of the agreement by a sufficient number, by offering policyholders a gambler's chance that by staying out of the agreement while enough others went in they might recover one hundred per cent of their claims. Clearly the purpose of all the actors in relation to the agreement and the theory of the law under which they acted was to offer the agreement as a probably preferable alternative to ordinary liquidation to such policyholders as desired to accept it, while at the same time avoiding any compulsion by preserving to nonassenters such rights as the law would give them in liquidation and no more. With this background in mind it becomes obvious that the present contention of the nonassenters faces the most formidable difficulties, and that it should be adopted only for the most compelling reasons.

The nonassenters contend that they have found sufficient reason in the first of two consecutive paragraphs contained in the Reinsurance Agreement. Since it is plain that the two paragraphs must be read together and not separately we reproduce both paragraphs in the order in which they appear in the agreement.

"Any person accepting the benefits herein contained

shall thereby be deemed to have entered into a novation with the Union Mutual on the terms and conditions hereinabove set forth and to have released the Accident Company and the Receiver from all claims, liabilities or obligations with respect to his policy or policy claim.

"Any person accepting the benefits herein contained or deemed to have accepted and assented to and be bound hereby, as above provided, shall thereby be conclusively deemed to have sold, transferred and assigned to the Receiver for the purpose of carrying out this agreement all his claim to and all his right, title and interest in and to all assets and other property of the Accident Company and the Receiver and any and all dividends or distributions to which he would be entitled upon and from the liquidation of the Accident Company in the above mentioned proceedings."

The argument of the nonassenters is that by the first of these paragraphs those who assented released all provable claims; that they had nothing left to assign to the receiver under the second paragraph; and that the second paragraph was therefore intended only as in the nature of a still further release or further assurance in support of the release contained in the first paragraph. We cannot agree. Whether these two paragraphs are phrased in the most happy manner or whether, if literally read, they may be inconsistent, is not worth extended discussion. If these two paragraphs are projected upon the background already described and are read in connection with the statute, the decree, and the Reinsurance Agreement as a whole and in the light of the purpose intended to be accomplished, the overall meaning is reasonably clear. The first paragraph makes it plain that the assenting policyholder is to release all right actually to prove for his own benefit any claim in the receivership, and so far as he himself is concerned he is to look solely to his rights against the Union Mutual under the agreement. The second paragraph is a device for keeping ostensibly alive the claims of assenters to the extent of using them in ascertaining the total of all provable claims as of February 23, 1940, in order to calculate the rate of

dividend that would have been payable on claims of non-assenters if the liquidation had proceeded without the intervention of a reinsurer. The assignment to the receiver under the second paragraph is in a sense a fiction. It is only "for the purpose of carrying out this agreement." It was not intended to leave actual assets in the receiver's hands, representing the claims of assenters, which he must later divide among nonassenters. Some other device or some other form of words indicating that the rate of dividend to nonassenters was to be calculated with reference to all provable claims as they were at the close of business on February 23, 1940, and not as if the nonassenting claims were the only claims, would have served the purpose as well. Construed in this way, the agreement is consistent in itself and is in harmony with the general object sought to be accomplished. A literal construction of particular clauses of a document must often yield to a broader view of the object to be attained. *Morrill & Whiton Construction Co.* v. *Boston,* 186 Mass. 217, 220. *Radio Corp. of America* v. *Raytheon Manuf. Co.* 300 Mass. 113, 117. *Central Trust Co.* v. *Rudnick,* 310 Mass. 239, 244.

For the purpose of calculating the rate of dividend to be paid to nonassenters the assets must also be taken at their value as of February 23, 1940, before any payment was made by the receiver to the Union Mutual for the "non-can" fund or otherwise under the agreement. Consistency requires this. The nonassenting policyholders and the general creditors who were not policyholders at all and never had a chance to assent or dissent cannot be deprived of the benefit of assets turned over to the Union Mutual, since in "straight liquidation" proceedings they would have had the benefit of those assets. There is no provision to the contrary in Part II, paragraph 3, of the agreement. That paragraph seems to us to recognize that assets turned over by the receiver to the Union Mutual must be treated as assets of the company so far as affects the rights of nonassenters. Paragraph 3 also recognizes that the court is not necessarily bound to accept the method there provided for valuing these assets.

We therefore hold that the receiver may "prove," that is, include in the calculations by which dividends to nonassenters and to general creditors are determined, the claims of assenting holders of noncancellable policies as of February 23, 1940. The amounts of such claims are to be ascertained on the same bases as laid down in this opinion for the similar claims of nonassenters.

5. Questions arise as to whether the value of the cancellable business, together with the agency organization and the good will of the company as a going concern, should be included as an asset in calculating the dividends on proved claims, and if included at what value it should be taken. Although the noncancellable business had been conducted at a loss and had no value, the cancellable business, in connection with the agency organization and good will of the company, on the findings of the master, had a value even as late as February 23, 1940. This asset was capable of preservation and sale separately from the noncancellable business. The Reinsurance Agreement demonstrates that fact, although that agreement was more than a mere sale of the cancellable business. The master finds that it is difficult to ascertain the value of this business with any degree of accuracy. He nevertheless finds "on all the evidence" that "said assets had a value of *at least* $200,000" (italics ours). In view of the terms of the decree of recommittal after which the master made this finding it must be presumed that he made it "upon a solid foundation of fact and not upon guess or conjecture." The evidence is not before us. The subsidiary findings are not inconsistent with the final conclusion. On the contrary they indicate that the master was fully aware of the difficulties involved in valuing assets of this kind and that he scrupulously carried out the direction of the court to find "a minimum valuation" which the evidence would support, even if beyond that there might possibly be additional value not capable of ascertainment by adequate proof. The receiver contends in substance that the value of the cancellable business should be ascertained by what the Union Mutual paid for it as shown by figures in the Reinsurance Agreement. But one sufficient reason why

this cannot be done is that in the agreement the Union Mutual, in order to get the cancellable business, had to agree to expose itself to burdensome obligations with relation to the noncancellable business. The agreement does not disclose any separate price paid for the cancellable business. The master's finding of a value for that business of $200,000 on February 23, 1940, must stand. Since the value of the cancellable business as that of a going concern was an asset on February 23, 1940, of which dissenting policyholders and general creditors would have had the benefit in "straight liquidation," its value must be included with the value of other assets as of that day in calculating dividends payable to such policyholders and creditors. But the master in the statement of assets set forth in his first report has already included as an asset forty-five per cent of the pro rata unearned premium reserve for cancellable policies. This amounts to $46,163.20. By the terms of the Reinsurance Agreement that sum was for the time being left in the receiver's hands. The addition to the asset side of the master's statement of the value of the cancellable business will therefore increase the total assets as set forth by him by the difference between $200,000 and $46,163.20, or $153,-836.80.

We have dealt with all matters presented and argued. An interlocutory decree is to be entered overruling all exceptions to either of the master's reports and confirming the reports, subject, however, to any finding the single justice may make in the matters hereinbefore left open as to exactly what sum is the net present value as of February 23, 1940, of the total expected benefits payable to nondisabled holders of noncancellable policies, and a decree, final as to the matters here determined, is to be entered in accordance with this opinion.

*Ordered accordingly.*