# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: Penn Treaty Network America | : | No. 1 PEN 2009 |
| Insurance Company (In Liquidation) | : | |
| | | |
| In Re: American Network Insurance | : | No. 1 ANI 2009 |
| Company (In Liquidation) | : | Argued: March 18, 2021 |


BEFORE:    HONORABLE P. KEVIN BROBSON, President Judge
           HONORABLE MARY HANNAH LEAVITT, Judge (P.)
           HONORABLE J. ANDREW CROMPTON, Judge

OPINION
BY JUDGE LEAVITT                                    FILED: July 9, 2021

The Pennsylvania Insurance Commissioner, Jessica K. Altman, in her capacity as Statutory Liquidator of Penn Treaty Network America Insurance Company (In Liquidation) (PTNA or Penn Treaty) and American Network Insurance Company (In Liquidation) (ANIC) (together, the Companies), has applied to this Court for a declaration that she is authorized under Article V of The Insurance Department Act of 1921 (Article V)[1] to allocate assets from the Companies' estates to pay policyholder claims for benefits that exceed applicable statutory guaranty association limits and accrue more than 30 days after the Companies' policies were terminated by virtue of the Companies' liquidation. Intervenors Anthem, Inc. and UnitedHealthcare Insurance Company (Health Insurers) oppose the Liquidator's application as contrary to Article V and the applicable state guaranty association statutes. For the reasons set forth herein, the Liquidator's application is denied.

---

[1] Act of May 17, 1921, P.L. 789, *as amended*, added by the Act of December 14, 1977, P.L. 280, 40 P.S. §§221.1 – 221.63.

**Background**

The Companies were organized as Pennsylvania-domiciled stock life insurance companies and specialized in long-term care insurance. Long-term care insurance provides coverage for some of the costs of skilled nursing care, intermediate care and custodial care, whether provided in a nursing home, an assisted living facility or the policyholder's home. To be eligible for coverage, a policyholder must satisfy the policy's benefit triggers, which vary depending on whether the policy is tax qualified or non-tax qualified.[2]

The Companies' policies contained terms typical of long-term care insurance. After a predetermined waiting period, typically 30 to 60 days, the policies paid a daily benefit ranging from $60 to $300 per day without regard to the actual cost of the services incurred by the policyholder. The Companies' policies had benefit periods ranging from 1 to 10 years. Some policies provided unlimited lifetime benefits; other policies limited the lifetime benefit by dollar amount, *e.g.*, $100,000. A policyholder goes off claim upon death or if he or she recuperates from the condition that caused the claim.

The Companies' long-term care insurance policies were guaranteed renewable, meaning that policyholders were guaranteed the right to renew their annual policies irrespective of their advanced age or declining health, so long as

---

[2] In 1996, Congress enacted legislation to qualify the premium on certain long-term care insurance policies as deductible for purposes of federal income taxes. To be tax qualified, a policy must conform to the requirements in Section 7702B of the Internal Revenue Code, 26 U.S.C. §7702B, most notably with limits on benefit triggers. In a non-tax qualified policy, benefit eligibility is more easily established and not based upon objective criteria. Rather, a treating physician's letter that the care covered by the policy is "medically necessary" establishes eligibility. *See Consedine v. Penn Treaty Network America Insurance Company*, 63 A.3d 368, 382 (Pa. Cmwlth. 2012). Non-tax qualified policies are more challenging to manage from a claim perspective. *Id*. at 383.

they paid their premiums. Further, their premiums could not increase because of the policyholder's age or medical condition. The policies authorized the Companies to increase premium rates, subject to approval by state insurance regulators, only where the increases were warranted given the claims experience of the cohort of policyholders covered by the same policy form. The policies usually suspended the policyholder's obligation to pay the premium when the policyholder goes on claim.

The Companies' long-term care policies were priced at a level premium for the life of the policy. In a level premium policy, the insurer collects more premium in the early years than it pays in claims; this pattern reverses in later years as policyholders age and present claims. *See* 31 Pa. Code §84a.3 (explaining that in a "level premium" policy the "premium is more than needed to provide for the cost of benefits during the earlier years of the policy and less than the actual cost in the later years. The building of a prospective contract reserve is a natural result of level premiums."). Because of this mismatch in cash flows, long-term care insurers set aside and invest the excess cash flow collected in the early years to establish an active life reserve for policies that are not yet on claim. As the block of business ages, the insurer draws down the active life reserve to pay claims as they develop in the later years of the policy's duration. The active life reserve constitutes a liability of the insurer.[3]

---

[3] This Court's previous discussion of the above terminology is instructive here:

> [S]tatutory reserves are established to ensure that the insurer will have the funds needed to pay all present claims and those that develop in the future. The Companies' claim reserves state the amount expected to be paid on open and incurred claims; the active life reserves state the amount expected to be paid on future claims to be developed by the "active lives," *i.e.*, policyholders not on claim. The gross premium reserve tests whether the statutory reserves meet the minimum statutory reserve requirements and must be done by insurers engaged in

Under Section 503 of Article V, an insurer is insolvent if it cannot "pay its obligations when they are due, or whose admitted assets do not exceed its liabilities plus the greater of (i) any capital and surplus required by law for its organization, or (ii) its authorized and issued capital stock." 40 P.S. §221.3. In 2009, the Insurance Commissioner concluded that the Companies were insolvent within the meaning of Section 503 and, with the agreement of the Companies, requested this Court to place the Companies into receivership. The Companies' insolvency was largely attributed to the underpricing of non-tax qualified policies that were issued before 2001 and rich in benefits. As the availability of assisted living facilities expanded, claims rose to a degree not anticipated when the level premium was established. Similarly, the actuarial assumptions for policy persistency and the frequency and severity of claims did not develop as expected. Accordingly, the Companies' active life reserves became understated.[4]

On March 1, 2017, after attempts to rehabilitate the Companies were unsuccessful, the Court placed the Companies into liquidation. The Court's liquidation orders directed the Liquidator to take possession of the Companies' property, business and affairs and to administer them in accordance with Article V. *See generally In Re: Penn Treaty Network America Insurance Company in Rehabilitation* (Pa. Cmwlth., No. 1 PEN 2009, order filed March 1, 2017).[5] The Court further ordered:

> long-term care business on an on-going basis. The gross premium reserve tests reserve levels, but it does not inform the reader how much money a company will have to pay claims at a point in time.

*Consedine*, 63 A.3d at 419 (citations omitted).

[4] For a more detailed discussion of the conditions that caused the Companies' insolvency, *see Consedine*, 63 A.3d at 380-85.

[5] An identical liquidation order was entered for ANIC. *See In Re: American Network Insurance Company in Rehabilitation* (Pa. Cmwlth., No. 1 ANI 2009, order filed March 1, 2017).

> Not later than thirty (30) days from the effective date of this Liquidation Order, *the Liquidator will transfer policy obligations, including the continued payment of claims and continued coverage arising under PTNA's policies, to state guaranty funds*. The Liquidator will make PTNA's facilities, computer systems, books, records, and third-party administrators (to the extent possible) available to any guaranty association (and to states and state officials holding statutory deposits for the benefit of such claimants).

*Id.* at 5 (emphasis added).

Subsequently, the Court ordered that policyholders were not required to file proofs of claim with the Liquidator for losses arising under their policies because responsibility for policy claims had been transferred to the state guaranty associations. *In Re: Penn Treaty Network America Insurance Company in Liquidation* (Pa. Cmwlth., No. 1 PEN 2009, order filed March 7, 2017).[6] The Court also authorized the Liquidator, pursuant to Section 536 of Article V, 40 P.S. §221.36, to advance funds from the Companies' estates to the state guaranty associations that had assumed responsibility for the Companies' policy claim and coverage obligations. These so-called early access agreements require the guaranty associations to return distributions that prove, over time, to exceed their proportional share of estate assets.

Under the applicable statutes in each policyholder's state of residence, guaranty associations have continued the long-term insurance coverage for the Companies' policyholders. In Pennsylvania, the Pennsylvania Life and Health Insurance Guaranty Association (PLHIGA) fulfills that statutory duty. PLHIGA's enabling act is codified in Article XVII of The Insurance Company Law of 1921,

---

[6] An identical order was entered for ANIC. *See In Re: American Network Insurance Company in Liquidation* (Pa. Cmwlth., No. 1 ANI 2009, order filed March 7, 2017).

5

Act of May 17, 1921, P.L. 682, *as amended*, added by the Act of December 18, 1992, P.L. 1519, 40 P.S. §§991.1701 – 1717 (PLHIGA Act).[7]  Generally, each state's guaranty association continues coverage in accordance with the policy's terms but limits the total benefits a resident policyholder may receive to the amount prescribed in the applicable guaranty association statute.  *See, e.g.*, Section 1703(c)(1)(ii)(A) of the PLHIGA Act, 40 P.S. §991.1703(c)(1)(ii)(A) (coverage of Pennsylvania residents insured by insolvent long-term care insurer capped at $300,000 in lifetime benefits).  Guaranty association coverage is provided per person, not per policy.  *Id.*  In no case does the resident receive more than was provided in her policy.  Accordingly, if the guaranty association pays up to $300,000, and the policy had a lifetime maximum of $100,000, the guaranty association pays up to $100,000.

A cap of $300,000 is followed by most state guaranty associations.[8] Most states allow the guaranty association to meet its obligations either by reissuing the insolvent insurer's policies or by issuing alternative policies, in each case at actuarially justified rates.  *See, e.g.*, Section 1706(c) and (d) of the PLHIGA

---

[7] The PLHIGA Act was substantially amended in 2020.  *See* Act of November 3, 2020, P.L. 1097, No. 113.  Pursuant to Section 4 of that act,

> [a]ll matters relating to the insolvency or impairment of any member insurer placed under an order of liquidation by a court of competent jurisdiction with a finding of insolvency before the effective date of this section, [November 3, 2020,] or for which the association otherwise exercises its powers and duties under section 1706(a) or (b) before the effective date of this section, including past, present and future assessments and credits, shall be governed by the provisions of Article XVII in effect before the effective date of this section.

Because the Companies were placed into liquidation and deemed insolvent before November 3, 2020, the prior version of the PLHIGA Act applies here.  Accordingly, all references to the PLHIGA Act in this opinion are to the prior version of the act.

[8] One notable exception is New Jersey, which is the only state with no cap on benefits.  *See* N.J. Stat. Ann. §17B:32A-3(d)(4) (West 2021).

Act, 40 P.S. §991.1706(c), (d). Guaranty associations are funded by distributions of estate assets and by assessments paid by their member insurers. Because long-term care insurance is a form of accident and health insurance, the member insurers that are responsible for the costs of continuing the long-term care insurance coverage of the Companies' policyholders are health insurers, who may or may not have written long-term care insurance. *See, e.g.*, Section 1707 of the PLHIGA Act, 40 P.S. §991.1707. Some state guaranty association laws authorize member insurers to recoup some of their assessments through premium tax offsets. Pennsylvania is one such state. Section 1711 of the PLHIGA Act, 40 P.S. §991.1711.

At the time of the Companies' liquidation, PTNA had 65,886 policies in force and ANIC had 7,050 policies in force. Joint Stipulation of Facts filed April 3, 2020 (Stipulation) ¶12. The Liquidator had established $3,795.4 million in reserves for PTNA's future policy obligations and $591.5 million in reserves for ANIC's future policy obligations. *Id*. ¶15. These reserves represented the actuarial judgment of the present value of (i) future policy benefits and expenses less (ii) future premiums (without any assumption for future rate increases). *Id*. The Liquidator estimated that of these amounts, $2,326.6 million in reserve liability would be assumed by the guaranty associations for PTNA and $398.1 million would be assumed by the guaranty associations for ANIC. *Id*. At liquidation, PTNA had $337.1 million in admitted assets and ANIC had $131.4 million in admitted assets. *Id*. ¶16. The parties did not stipulate to the Companies' annual premium revenue, but in 2010, annual cash flow was approximately $277 million; at that time annual claims of $236 million were paid without liquidating assets. *Consedine*, 63 A.3d at 380.

7

The guaranty associations in 47 states and the District of Columbia have filed for premium rate increases in their respective states for the coverage they provide to the Companies' policyholders. Stipulation ¶26. As of February 2020, rate increases were approved by 46 states and the District of Columbia. *Id*. Approved rate increases through mid-August 2019 ranged from 4.0% to 410.0%, with an average of 42%. *Id*. ¶23. Sixteen states approved rate increases to be phased-in over multiple years, and two state guaranty associations (New Mexico and Washington) filed for a second rate increase. *Id*. The rate increase requests were based on the guaranty associations' actuarial calculation of what the premium would have been at policy inception if (i) the policy had been written at coverage limits provided by the applicable guaranty association statute and (ii) actual claim and cost experience were known at the time the long-term care insurance policy was issued. *Id*.

As of June 30, 2019, the estate of PTNA had $345.8 million in assets, inclusive of $173.4 million advanced to the guaranty associations pursuant to early access agreements.[9] Stipulation ¶48. The estate of ANIC had $141.7 million in assets, inclusive of $59.7 million advanced to guaranty associations. *Id*. ¶49. Also, as of June 30, 2019, the Companies had 53,918 policies. *Id*. ¶41. Of that total, PTNA issued 48,354 of the policies and ANIC issued 5,564. *Id*. ¶¶42, 43. The Liquidator projects that as of June 30, 2019, the present value of (i) future policy benefits plus expenses less (ii) future premiums, which would have been owing by PTNA were it not in liquidation, is $3,512.8 million. *Id*. ¶46. The Liquidator estimates that of that amount, $1,939.8 million will be covered by the

---

[9] The parties have not stipulated to what extent the Companies' assets may increase as a result of the Liquidator's efforts to pursue recoveries on behalf of the Companies.

guaranty associations. *Id.* For ANIC, those figures are $486.8 million and $278.3 million, respectively. *Id.* ¶47.

Stated otherwise, based on the above figures, state guaranty associations have assumed the obligation to pay benefits plus expenses less future premiums in the amount of approximately $2 billion to the Companies' policyholders. This approximate $2 billion obligation will be funded by estate assets and assessments upon member health insurers and, ultimately, the member insurers' policyholders and the public in states where premium tax offsets are available. As of December 31, 2018, the guaranty associations activated by the Companies' liquidations have collectively assessed their member companies in the amount of $2.047 billion and have called $1.978 billion of those assessed amounts. Stipulation ¶33. Through October 2019, the guaranty associations have paid approximately $707 million in benefits to the Companies' policyholders. *Id.* ¶32.[10]

The amount of future benefits plus expenses (net of future premium) owing under the PTNA and ANIC policies, were the Companies not in liquidation, that exceeds the amount covered by the guaranty associations is termed the Non-Guaranty Association (GA) Policy Benefits. *Id.* ¶47. The Liquidator projects that, at the time of the liquidation orders, approximately 43,200 policyholders had policies that exceeded guaranty association limits. Stipulation ¶52. As of June 30, 2019, approximately 34,000 of the 43,200 policies remained in force. *Id.*[11] As of June 30, 2019, 25 policyholders had exhausted the benefits available to them from their guaranty association due to the statutory limits. *Id.* ¶44. This number had

_____

[10] This amount does not include amounts paid to policyholders in exchange for the termination of policies in connection with the guaranty associations' rate increase program. Stipulation ¶32.

[11] The Liquidator projects that approximately 84.2% of the 34,000 policies will have liabilities for Non-GA Policy Benefits greater than $500.00. Stipulation ¶53. Liabilities for the remaining 15.8% are projected to be less than $500 per policy. *Id.*

risen to 300 policyholders as of the date of oral argument on this matter, March 18, 2021.

**Liquidator's Proposal**

Because some policyholders will reach state statutory guaranty association limits before reaching the limits of the policy issued by the Companies, the Liquidator took steps to create a way to pay claims in excess of guaranty association limits. To that end, the Liquidator entered into a partial assumption reinsurance agreement during the 30-day period following entry of the liquidation orders with a captive insurer,[12] Penn Treaty Plus, Inc. (Captive),[13] effective March 2, 2017. Under this partial assumption reinsurance agreement, the Captive will pay benefits to policyholders whose claims exceed state guaranty association limits or who were not eligible for guaranty association protection because, for example, such protection is limited to one claim per resident "regardless of the number of policies." *See, e.g.*, Section 1703(c)(l)(ii)(A) of the PLHIGA Act, 40 P.S. §991.1703(c)(1)(ii)(A).

Presently, the Liquidator seeks authorization from this Court to distribute some of the Companies' assets to the Captive to pay Non-GA Policy Benefits. Based on the information available as of June 30, 2019, and using a

---

[12] A "captive insurance company" is a risk-financing method or form of self-insurance involving the establishment of a subsidiary corporation or association organized to write insurance. 3 COUCH ON INSURANCE §39:2 (3d ed. 2021). The creation of a captive insurance company can bring tax, economic, and commercial benefits, including access to reinsurance markets. *Id*. Captive insurance is a way to insure risks that are otherwise difficult to insure on the traditional insurance market. *Id*.

[13] The Captive is incorporated in the District of Columbia as a non-profit corporation and holds a certificate of authority from the District of Columbia's Department of Insurance, Securities and Banking. On March 28, 2017, $250,000 was deposited by PTNA into a bank account in the name of the Captive in exchange for a surplus note. Stipulation ¶37.

10

gross premium reserve methodology,[14] the Liquidator proposes to allocate approximately 61.2% of PTNA's available assets ($211.6 million) and 67.3% of ANIC's available assets ($95.4 million) to the guaranty associations and approximately 38.8% of PTNA's available assets ($117.3 million) and 32.7% of ANIC's available assets ($45.4 million) to the Captive. Stipulation ¶¶56, 58. Based on this proposed allocation of the Companies' assets, the Liquidator estimates that the Captive will be able to cover approximately 10% of the Non-GA Policy Benefit claims. *Id.* ¶59. The Liquidator also estimates that approximately 10% of the benefits provided by the guaranty associations will be funded by estate assets. *Id.* ¶60.

In support of her petition, the Liquidator asserts that policyholder claims for Non-GA Policy Benefits are entitled to be paid regardless of when the loss arises. She proposes to accept and value policyholder claims for Non-GA Policy Benefits under one of two legal theories. First, the Liquidator argues that she can pay Non-GA Policy Benefits as claims under active policies of insurance, *i.e.*, the coverage provided by the guaranty associations and the coverage to be provided by the Captive. Second, in the alternative, assuming the Companies' policies have been terminated by operation of law under Article V, the Liquidator contends that she can pay the Non-GA Policy Benefits as claims for breach of contract, *i.e.*, the termination of the Companies' policies by reason of their liquidation. The Liquidator argues that her plan to use the Captive to fund claims for Non-GA Policy Benefits comports with the unifying purpose of the governing statutes, *i.e.*, Article V and the PLHIGA Act, because it is designed to minimize harm to policyholders from liquidation.

---

[14] *See supra* note 3.

11

The intervening Health Insurers, who are members of PLHIGA and other life and health guaranty associations, oppose the Liquidator's application. The Health Insurers assert that under the governing statutes, as specifically held by Pennsylvania courts, claims against an insolvent insurer's estate that arise from an insurance policy more than 30 days after the entry of a liquidation order are valued at $0. This is because the insolvent insurer's policies terminate 30 days after the entry of a liquidation order. Here, the guaranty associations will pay claims of the Companies' policyholders without regard to when the claims arose because the associations will continue the coverage formerly provided by the Companies' policies. The Health Insurers argue that the Liquidator's proposal to create a facility to pay claims in excess of those paid by guaranty associations departs from Article V and applicable guaranty association statutes. They argue that the estate assets that the Liquidator proposes to distribute to the Captive are owed to the guaranty associations.

**Article V**

Article V authorizes the Liquidator to administer the estate of an insolvent insurer, and it specifies the procedures the Liquidator must follow in marshalling and distributing the insurer's assets in accordance with the priorities established for creditor claims. Upon the issuance of an order of liquidation by this Court, the rights and liabilities of the insurer, its policyholders and creditors "*shall become fixed as of the date of filing of the petition for liquidation, except as provided in sections 521* and 539." Section 520(d) of Article V, 40 P.S. §221.20(d) (emphasis added). Section 521 provides that policies in effect on the date of liquidation continue in effect for no more than 30 days. It states:

> *All insurance in effect at the time of issuance [of] an order of liquidation shall continue in force only with respect to the risks*

12

*in effect, at that time* (i) *for a period of thirty days* from the date of entry of the liquidation order; (ii) until the normal expiration of the policy coverage; (iii) until the insured has replaced the insurance coverage with equivalent insurance in another insurer or otherwise terminated the policy; or (iv) until the liquidator has effected a transfer of the policy obligation pursuant to section 523(8), *whichever time is less*.

40 P.S. §221.21 (emphasis added). Stated otherwise, insurance policies in effect on the date of a liquidation order terminate 30 days later (Termination Date), or earlier where the policyholder obtains replacement coverage or the Liquidator transfers the policies to an assuming insurer prior to the Termination Date. To this end, Section 523(8) of Article V expressly authorizes the Liquidator "[t]o use assets of the estate to transfer policy obligations to a solvent assuming insurer, *if the transfer can be arranged without prejudice to applicable priorities under section 544*." 40 P.S. §221.23(8) (emphasis added).

Our Supreme Court has construed the meaning of Section 521 as follows:

[W]e conclude that the Liquidator advances the correct interpretation of the prefatory language … , namely, that the phrase "[a]ll insurance in effect" means any insurance policy that continues to provide coverage to its policyholders as of the date the Commonwealth Court enters an order of liquidation.

*Warrantech Consumer Products Services, Inc. v. Reliance Insurance Company in Liquidation*, 96 A.3d 346, 356 (Pa. 2014). The Court reasoned that Section 521 "relaxes the rule announced in Section [520](d) (fixing the rights and liabilities of an insurer entering liquidation) by providing policyholders, whose insurance coverage would otherwise be terminated as of the date of the filing of the petition for liquidation, a thirty-day window to acquire replacement insurance." *Id.*

13

The *Warrantech* Court next addressed the significance of terminating all insurance policies issued by an insolvent insurer 30 days after the entry of a liquidation order, *i.e.*, November 2, 2001. It held:

> [W]e conclude that Section [521] of the Insurance Department Act operates to terminate all claims against the estate of an insurer by the policyholders no later than thirty days after the filing of a petition for liquidation with respect to "risks in effect" at the time the Commonwealth Court issues an order of liquidation, regardless of whether the claims are based on insurance policies with active policy periods at the time of liquidation. The order of the Commonwealth Court finding that Section [521] relieves Reliance [(the insolvent insurer)] of all liability for claims … that occurred after November 2, 2001 is therefore affirmed.

*Id.* at 358. The Supreme Court acknowledged that the termination of a policy 30 days after the order of liquidation works a hardship because the policyholder may be required to purchase replacement coverage at a greater cost. Nevertheless, the Court explained that

> *barring claims against insolvent insurers after a certain date,* while it may work hardships on certain parties, *is necessary* to *permit the Liquidator to manage effectively existing liabilities for the ultimate benefit of all claimants of insolvent insurers*. In Sections [520](d) and [521], the General Assembly struck a balance between the interests of policyholders, creditors and the public generally by fixing the rights of all parties with an interest in the estate of an insurer entering liquidation as of the date the petition for liquidation is filed, while making an exception for insurance policies with risks in effect at the time of liquidation by extending coverage for no more than thirty days to provide affected policyholders an opportunity to purchase replacement insurance.

*Id*. at 357 (emphasis added) (citation omitted).

14

Section 544 of Article V sets forth the order of distribution of estate assets to pay the claims of the insolvent insurer's creditors. In summary, this distribution proceeds as follows:

(a) Costs and expenses of administration (including the costs of preserving or recovering the assets of the insurer; attorney fees; and the expenses of guaranty associations in handling claims);

(b) *All claims under policies for losses wherever incurred*;

(c) Claims of the federal government;

(d) Certain debts due to employees of the insurer;

(e) Claims for unearned premium or other premium refunds, and claims of general creditors;

(f) Claims of state or local governments;

(g) Certain special claims;

(h) Certain notes and obligations and other premium refunds; and

(i) Claims of shareholders or other owners.

*See* Section 544 of Article V, 40 P.S. §221.44. Significantly, the introductory paragraph to Section 544 states that every claim in each class must be paid in full before the members of the next class receive any payment, and "[n]o subclasses shall be established within any class." *Id*.

## Guaranty Association Statutes

As noted, in the liquidation of a life and health insurance insurer, PLHIGA continues coverage for eligible policyholders, subject to coverage limits prescribed in the PLHIGA Act. Section 1701 of the PLHIGA Act, 40 P.S. §991.1701 (creating PLHIGA "to pay benefits and to continue coverages as limited herein, and members of the association are subject to

15

assessment to provide funds to carry out the purpose of this article"). Specifically, PLHIGA provides coverage to resident policyholders of direct, non-group life insurance, health insurance, annuity and supplemental policies or contracts; certificates under direct group policies and contracts; and unallocated annuity contracts issued by member insurers. Section 1703(b)(1) of the PLHIGA Act, 40 P.S. §991.1703(b)(1). Non-resident policyholders may also be eligible for coverage if they meet the conditions set forth in Section 1703(a)(2)(ii) of the PLHIGA Act. 40 P.S. §991.1703(a)(2)(ii).[15]

In carrying out its statutory duties, PLHIGA assumes the policy obligations of the insolvent insurer or causes those obligations to be assumed by a solvent insurer. Section 1706(c) of the PLHIGA Act, 40 P.S. §991.1706(c). PLHIGA may arrange for substitute coverage by reissuing the terminated policy or issuing an alternative policy. Section 1706(d)(2)(i) of the PLHIGA Act, 40 P.S. §991.1706(d)(2)(i). Policyholders must pay premiums to keep their coverage, which "shall belong to and be payable at the direction of [PLHIGA]." Section 1706(g) of the PLHIGA Act, 40 P.S. §991.1706(g). The failure to make timely payment on a premium invoice terminates PLHIGA's obligations, except for

---

[15] Section 1703(a)(2)(ii) of the PLHIGA Act provides that non-resident policyholders are eligible for coverage if they satisfy all of the following conditions:

(A) the insurers which issued such policies or contracts are domiciled in this Commonwealth;

(B) such insurers never held a license or certificate of authority in the states in which such persons reside;

(C) these states have associations similar to the association created by this article; and

(D) these persons are not eligible for coverage by those associations.

40 P.S. §991.1703(a)(2)(ii).

16

claims that were already incurred by PLHIGA. Section 1706(f) of the PLHIGA Act, 40 P.S. §991.1706(f).

PLHIGA's coverage to resident policyholders is capped at $300,000 in lifetime benefits; is provided per person; and is subject to the contractual obligations of the insolvent insurer. Section 1703(c)(1)(ii)(A) of the PLHIGA Act, 40 P.S. §991.1703(c)(1)(ii)(A). To cover its obligation to provide coverage and pay claims, PLHIGA assesses its member insurers by using the ratio of the premiums collected for business in Pennsylvania by each member insurer to the aggregate of all premiums collected on business in Pennsylvania by all member insurers. Section 1707(c)(2) of the PLHIGA Act, 40 P.S. §991.1707(c)(2).

By contrast, in the liquidation of a property and casualty insurer, the Pennsylvania Property and Casualty Insurance Guaranty Association (PPCIGA) is obligated only to

> pay *covered claims* existing prior to the determination of insolvency, arising within thirty (30) days after the determination of insolvency or before the policy expiration date if less than thirty (30) days after the determination of insolvency or before the insured replaces the policy or causes its cancellation if he does so within thirty (30) days of the determination.

Section 1803(b)(1)(i) of Article XVIII of The Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, *as amended*, added by the Act of December 12, 1994, P.L. 1005 (PPCIGA Act), 40 P.S. §991.1803(b)(1)(i) (emphasis added). The PPCIGA Act defines "covered claim" as "[a]n unpaid claim, including one for unearned premiums, submitted by a claimant, which arises out of and is within the coverage and is subject to the applicable limits of an insurance policy" issued by the insolvent insurer. Section 1802 of the PPCIGA Act, 40 P.S. §991.1802. In

17

short, the PPCIGA Act does not provide for replacement coverage of the policy terminated when the insolvent property and casualty insurer is ordered to be liquidated.

Similar to PLHIGA, PPCIGA obtains funding to satisfy claim obligations of insolvent insurers by assessments upon every insurance company that writes property and casualty policies in the Commonwealth. The assessment is calculated by using the ratio of "the net direct written premiums of the member insurer for the preceding calendar year on the kinds of insurance in an account" to "the aggregate net direct written premiums of all member insurers for the preceding calendar year on the kinds of insurance in such account." Section 1808(b) of the PPCIGA Act, 40 P.S. §991.1808(b).

PPCIGA's payment obligation is capped at $10,000 per policy for the return of unearned premium and $300,000 per claimant for all other covered claims, subject to any applicable policy limits. Section 1803(b)(1)(i) of the PPCIGA Act, 40 P.S. §991.1803(b)(1)(i). In addition, PPCIGA is not responsible for any first-party claim submitted by an insured whose net worth exceeds $25,000,000 as of December 31 of the year prior to the year in which the insurer becomes insolvent. Section 1802 of the PPCIGA Act, 40 P.S. §991.1802.[16] Further, the claimant or insured must be a resident of this Commonwealth at the time of the insured event in order to submit a claim with PPCIGA. It does not provide coverage in any circumstance to non-residents.

In sum, PLHIGA continues the coverage for which policyholders residing in Pennsylvania have bargained, up to a statutory limit, and it pays policyholder claims that accrue after the insolvent insurer's policies are terminated.

---

[16] There is no such net worth exclusion in the PLHIGA Act.

PPCIGA does not provide replacement coverage, and it does not pay policyholder claims that accrue more than 30 days after the termination of the insolvent insurer's policies.

**Liquidator's Arguments**

The Liquidator contends that the creation of a fund for the payment of Non-GA Policy Benefits is consistent with Article V. She contends that Non-GA Policy Benefits are priority level (b) "claims under policies for losses" under Section 544(b) of Article V, 40 P.S. §221.44(b), regardless of whether they arise before or after the termination of policies required by Section 521 of Article V, 40 P.S. §221.21. The full amount owed to policyholders under their policies, whether above or below guaranty association limits, is a class (b) claim. Treating them otherwise would impermissibly bifurcate policyholder claims into separate classes, which is prohibited by Section 544. The Liquidator argues that she may accept claims for Non-GA Policy Benefits as claims under policies of insurance or, if necessary, as breach of contract claims pursuant to common law principles.

Under the first of these theories, the Liquidator argues that the Non-GA Policy Benefits are claims arising under the Companies' active policies, which have been continued by state guaranty associations up to the statutory limits in each state. Responsibility for the benefits owed under the Companies' policies in excess of guaranty association limits has been transferred to the Captive, which the Liquidator asserts is a solvent insurer. There is no prejudice to the Section 544 priority scheme because the Non-GA Policy Benefits are class (b) claims. The Liquidator contends that Article V does not distinguish between class (b) claims that arise before a liquidation and those that arise more than 30 days after the Termination Date.

19

Alternatively, the Liquidator argues that if the Court concludes that the Liquidator did not effectively transfer a portion of the policy obligations to the Captive, claims for Non-GA Policy Benefits may be recognized as policyholder claims for breach of contract. Under this theory, the Liquidator posits that if the insurance policies terminated by operation of law on the thirty-first day after the liquidation orders pursuant to Section 521 of Article V, 40 P.S. §221.21, then such termination constitutes a compensable breach of contract. The Companies' breach of contract is not affected by coverage from the guaranty associations, which mitigate, but do not extinguish, the insurer's liability for failing to satisfy its contractual obligations. Guaranty associations receive an assignment of the policyholder's breach of contract claim against the company up to the limits of the guaranty association statute. Policyholders retain a breach of contract claim against the estates for the remainder.

The Liquidator argues that her decision to accept claims for Non-GA Policy Benefits is consistent with precedent. The Liquidator urges the Court to follow "a well-developed body of case law" recognizing a policyholder's breach of contract claim caused by the loss of insurance policy coverage. *See, e.g.*, *Commonwealth ex rel. Kirkpatrick v. American Life Insurance Company*, 29 A. 660 (Pa. 1894); *Commissioner of Insurance v. Massachusetts Accident Company*, 50 N.E.2d 801, 808-09 (Mass. 1943); *Caminetti v. Manierre,* 142 P.2d 741, 749 (Cal. 1943). The Liquidator argues that courts have continued to endorse the breach of contract theory even after the adoption of model liquidation statutes. *See, e.g.*, *In the Matter of Liquidation of Integrity Insurance Company*, 685 A.2d 1286, 1290 (N.J. 1996); *In re Executive Life Insurance Company*, 38 Cal. Rptr. 2d 453, 477 (Cal. Ct. App. 1995).

## Health Insurers' Response

The intervening Health Insurers argue that the Liquidator's proposal to use estate assets to pay Non-GA Policy Benefits violates Sections 520 and 521 of Article V, as interpreted by the Supreme Court in *Warrantech*, 96 A.3d 346. The Health Insurers assert that under Section 521 of Article V, the Companies' policies terminated 31 days after the entry of the liquidation orders. At that point, the guaranty associations became solely liable for claims arising under the Companies' policies, and the estates of the Companies have no liability. The Health Insurers argue that the Liquidator's legal theories for creating a fund to pay Non-GA Policy Benefits lack any connection to the provisions of Article V. There was no transfer of a part of the Companies' policies to a solvent insurer prior to the Termination Date and, further, treating the Non-GA Policy Benefits claims as breach of contract claims entitled to class (b) priority is inconsistent with Article V.

The Health Insurers contend that the Liquidator's plan disregards the fundamental bargain of the guaranty association system. Guaranty associations provide ongoing coverage for policyholders whose policies have terminated by operation of Section 521 and whose share of estate assets would be inadequate to enable those policyholders to purchase replacement long-term care insurance in the marketplace. To fund the long-term care coverage they provide, the guaranty associations are entitled to all of the assets of the Companies, which are inadequate when compared to the Companies' $2 billion unfunded liability to pay policyholder claims. The guaranty associations will have to fund that liability through assessments upon their member insurers. In turn, it is the current

21

policyholders of those member insurers that will provide the necessary funding along with state taxpayers.

## Standard of Review

The question presented is whether the Liquidator is authorized under Article V to set aside assets of an insolvent insurer to fund the payment of Non-GA Policy Benefits claims. This is a question of law and, as such, our standard of review is *de novo* and our scope of review plenary. *Warrantech*, 96 A.3d at 354. The Statutory Construction Act of 1972 directs that the object of all interpretation and construction of statutes is to ascertain and effectuate the legislature's intent. 1 Pa. C.S. §1921(a).

Section 520(c) of Article V vests the Liquidator with "title to all of the property, contracts and rights of action and all of the books and records of the insurer ordered liquidated[.]" 40 P.S. §221.20(c). To marshal estate assets for distribution to policyholders, guaranty associations and other creditors, the Liquidator enjoys broad authority "to do such other acts as are necessary or expedient to collect, conserve or protect [the insurer's] assets or property[.]" Section 523(6) of Article V, 40 P.S. §221.23(6). At the same time, Section 501(b) and (c) of Article V states that its provisions "shall be liberally construed to effect the purpose [of] … protection of the interests of insureds, creditors, and the public generally[.]" 40 P.S. §221.1(b), (c). To that end, Section 501(c) requires the "equitable apportionment of any unavoidable loss," in the manner directed by the legislature. Section 501(c)(iv) of Article V, 40 P.S. §221.1(c)(iv).

The liquidation of an insolvent insurer follows a rigid procedure, as this Court explained in *Grode v. Mutual Fire, Marine and Inland Insurance Company*, 572 A.2d 798 (Pa. Cmwlth. 1990), *affirmed*, *Foster v. Mutual Fire,*

22

*Marine and Inland Insurance Company*, 614 A.2d 1086 (Pa. 1992). At issue in *Grode* was a plan of rehabilitation that was challenged by reinsurers, policyholders and creditors on the grounds that it was, in reality, a liquidation, not a true rehabilitation. In analyzing that charge, President Judge Crumlish observed that "the benefits of rehabilitation – its flexibility and avoidance of inherent delays – are preferable to the static and cumbersome procedures of statutory liquidation." *Id*. at 803. More to the point, the liquidation scheme in Article V "fixes the rights and liabilities of the insurer and its creditors *as of a date certain*, … [*and*] *establishes an order of distribution*[.]" *Grode*, 572 A.2d at 804 (emphasis added) (citations omitted). Stated otherwise, the Insurance Commissioner, as statutory rehabilitator, has much broader discretion to structure a rehabilitation plan with an eye toward equitable considerations and far less discretion as statutory liquidator. *Id*. at 803.

## Discussion

The Liquidator proposes to allocate the Companies' estate assets to guaranty associations for their claim and coverage obligations and to the Captive for payment of claims in excess of guaranty association limits. The Health Insurers first challenge this proposal as contrary to Sections 520 and 521 of Article V.

Section 520(d) of Article V provides that upon the issuance of an order of liquidation of an insolvent insurer, "the rights and liabilities of any such insurer and of its creditors, policyholders, shareholders, members and all other persons interested in its estate *shall become fixed* as of the date of filing of the petition for liquidation, except as provided in sections 521 and 539." 40 P.S.

23

§221.20(d) (emphasis added).[17] Under Section 521, policies remain in force for no more than 30 days after the entry of the liquidation order. Policy claims that accrue during that 30-day period are allowed, but claims accruing after the 30-day period are not allowed against the estate. Necessarily, the Non-GA Policy Benefits claims will accrue long after the Termination Date, which is March 31, 2017. Those claims are directly barred by the plain text of Sections 520 and 521 and the Pennsylvania Supreme Court's construction of those provisions in *Warrantech*.

The Liquidator's workaround Sections 520 and 521 was to establish the Captive for payment of Non-GA Policy Benefits claims before the Termination Date. Assuming, *arguendo*, that the Captive is a "solvent insurer," there is no statutory authority for a transfer of estate assets to this captive. Section 523(8) of Article V permits a transfer of policies to a "solvent assuming insurer" so that the insurance policy can resume its ordinary course. 40 P.S. §221.23(8). This transfer is an alternative to guaranty association coverage. Section 523(8) does not authorize the Liquidator to sever each policy into two parts, sending one part of the policy to the applicable guaranty association and the remainder to a captive insurer to pay Non-GA Policy Benefits claims. Further, the Companies' long-term care policies contain no language that would authorize such a policy severance. Splitting a single policy's claims below and above guaranty association limits creates subclasses of policyholder claims, which is prohibited by Section 544 of Article V, 40 P.S. §221.44 ("No subclasses shall be established within any class.").

---

[17] In the Companies' receivership, the Insurance Commissioner, as Statutory Rehabilitator, filed a Verified Petition to Convert Rehabilitation to Liquidation for ANIC on July 27, 2016, and for PTNA on August 2, 2016. The petitions thereafter settled and the Court entered the liquidation orders on March 1, 2017.

What is more, the Liquidator does not identify the Non-GA Policy Benefits the Captive will pay. Instead, the Liquidator seeks authorization for the Captive to pay "an equitable portion" of the Non-GA Policy Benefits. Application ¶23. This creative proposal goes far beyond the type of transfer contemplated by Section 523(8).

The Liquidator argues, in the alternative, that the proposed asset transfer to the Captive for paying Non-GA Policy Benefits is premised on a policyholder claim for breach of contract that is entitled to class (b) priority. There are flaws in the Liquidator's premise.

First, the breach of contract claims posited by the Liquidator would seek payment of damages for the termination of the policy, not payment of policy benefits. Damages for breach of contract claims would be general creditor claims entitled to class (e) priority, not the class (b) priority accorded to "claims under policies for losses" contemplated by Article V's priority scheme. *See Consedine*, 63 A.3d at 446 ("Here, losses that occur more than 30 days after the liquidation would be covered by the replacement guaranty fund coverage; they would not be losses *under* a PTNA or ANIC policy." (emphasis in original)). Even assuming that breach of contract claims are assigned a class (b) priority because they would be filed by policyholders, they would have to be given a zero valuation, as in *Warrantech*. This is because the insurer's failure to perform due to insolvency is not one of the "losses wherever incurred" referred to in the priority scheme set forth in Section 544(b) of Article V, 40 P.S. §221.44(b). Rather, the loss must relate directly to "claims under policies for losses." *Id*. Finally, a triggering event that occurs more than 30 days after the termination of the policy is not a liability of the insolvent insurer. *Warrantech,* 96 A.3d at 358 (holding that Section 521 of

25

Article V operated to terminate claims against the insurer estate where the benefit trigger occurred after the statutory cancellation of coverage date).

Second, the Liquidator's premise fails to read Article V *in pari materia* with the PLHIGA Act, as the legislature has directed. 1 Pa. C.S. §1932(b) ("Statutes in pari materia shall be construed together, if possible, as one statute."). Article V contains specific directions for the administration of the insolvent insurer's estate. Section 536 of Article V, entitled "Liquidator's proposal to distribute assets," provides, in relevant part, as follows:

> Within one hundred twenty days of a final determination that an insurer is insolvent or in such condition that its further transaction of business will be hazardous to its policyholders, or to its creditors, or the public by a court of competent jurisdiction of this Commonwealth, *the liquidator shall make application* to the Commonwealth Court for approval of a proposal *to disburse assets out of such company's marshalled assets*, from time to time as such assets become available, *to any guaranty association* in the Commonwealth or in any other states having substantially the same provision of law. The liquidator need not make application, as required above, in instances where it is reasonable to conclude that the assets of the insolvent insurer will not exceed the amounts necessary to pay the costs of liquidation *and the payment of claims of creditors either secured or with a priority higher than policyholders*. A guaranty association shall have the right to petition the Commonwealth Court to review an order of the liquidator concluding the assets will not exceed such costs.

40 P.S. §221.36(a) (emphasis added). In short, other than paying the administrative costs of liquidation and claims "with a priority higher than the claims of policyholders," the Liquidator must disburse the assets of the estate to the guaranty associations that assume the insurance coverage of the liquidated company. Section 536(b) reiterates that this disbursement of assets is mandatory,

26

stating that the Liquidator's "proposal *shall* at least include provisions for … (2) Disbursement of assets marshalled to date and subsequent disbursement of assets as they become available [and] … (3) Equitable allocation of disbursements to each of the associations entitled thereto." 40 P.S. §221.36(b)(2), (3).  Further, the Liquidator's proposal must

> provide for disbursements to the associations in amounts estimated to be at least equal to the claim payments made or to be made thereby for which such associations could assert a claim against the liquidator, and shall further provide that *if the assets available for disbursement from time to time do not equal or exceed the amount of such claim payments made or to be made by the associations then disbursements shall be in the amount of available assets*.

Section 536(c) of Article V, 40 P.S. §221.36(c) (emphasis added).

The Liquidator does not have discretion to disburse the assets of the estate in the way the Liquidator thinks is equitable for policyholders.  *See Grode*, 572 A.2d at 803 (contrasting the "flexibility" of rehabilitation with "the static and cumbersome procedures of statutory liquidation").  Rather, Article V requires those assets to be used to pay the costs of liquidation, the creditor claims that have a higher priority than policyholders (such as secured claims), and then to reimburse the guaranty associations for the funding of continued insurance coverage.  Section 536(a) of Article V, 40 P.S. §221.36(a).  Where assets do not equal the amount of claims to be "made by the associations *then disbursement shall be in the amount of available assets*."  Section 536(c) of Article V, 40 P.S. §221.36(c) (emphasis added).  This scheme requires the distribution of estate assets until all guaranty association liabilities have been covered by estate assets.  Consistent therewith, Section 536(b)(4) of Article V, 40 P.S. §221.36(b)(4), requires guaranty

27

associations to return some part of their disbursements when necessary to satisfy claims of a higher priority than those of policyholders. Section 536 makes claims of guaranty associations against the insolvent insurer estate class (b) claims under policies for losses.[18]

Consistent with Section 536 of Article V, the PLHIGA Act confirms that guaranty associations are entitled to the assets of the liquidated insurance company's estate so that they can continue all covered policies of the insolvent insurer. Section 1712(c) of the PLHIGA Act states as follows:

> For the purpose of carrying out its obligations under this article, the association shall be deemed to be a creditor of the impaired or insolvent insurer to the extent of assets attributable to covered policies reduced by any amounts to which the association is entitled as subrogee pursuant to section 1706. *Assets of the impaired or insolvent insurer attributable to covered policies shall be used to continue all covered policies and pay all contractual obligations of the impaired or insolvent insurer as required by this article.* Assets attributable to covered policies, as used in this subsection, are that proportion of the assets which the reserves that should have been established for such policies bear to the reserves that should have been established for all policies of insurance written by the impaired or insolvent insurer.

40 P.S. §991.1712(c) (emphasis added).

Section 1712(c) tracks the language found in Section 14.C of the National Association of Insurance Commissioners (NAIC) Life and Health Insurance Guaranty Association Model Act (NAIC Model Act), which has been

---

[18] Section 544(a) of Article V makes the "costs and expenses of administration" the highest priority in the order of distribution, including "the expenses of a guaranty association in handling claims." 40 P.S. §221.44(a). These class (a) administrative claims are distinct from the "claim payments" referred to in Section 536(c) of Article V, 40 P.S. §221.36(c), for which the guaranty association has a claim against the estate.

adopted in various forms in all but one state.[19] The Comment to the NAIC Model Act at Section 14.C explains as follows: "Since this Act imposes the obligation upon the Association to continue coverage for policyholders … of insolvent insurers, *the assets of the insolvent insurer ought to be used, to the extent available, for the purpose of continuing such coverage*. Subsections C and D are designed to accomplish this purpose." NAIC Model Act, Drafting Note to Section 14 (emphasis added).[20]

The third sentence of Section 1712(c) of the PLHIGA Act addresses the methodology for distributing estate assets to the guaranty associations. Each guaranty association is entitled to estate assets in an amount that represents its proportional share of the Liquidator's reserve established for the covered policies. The allocation of assets according to reserves is the methodology that was used by the courts at common law to distribute an insolvent insurer's assets to policyholders before the creation of the guaranty association system. *See, e.g.*, *Caminetti*, 142 P.2d at 741; *Commissioner of Insurance*, 50 N.E.2d at 808-09. Under the pre-guaranty association regime, policyholders would use their proportional share of assets to purchase a replacement insurance policy in the marketplace. Under the guaranty association regime, assets are instead transferred to the guaranty associations.

The first sentence of Section 1712(c) of the PLHIGA Act states that the guaranty association "shall be deemed to be a creditor of the … insolvent

---

[19] The NAIC Model Act is available on the NAIC website at https://content.naic.org/sites/default/files/model-law-520-life-health-guaranty.pdf (last visited July 8, 2021).

[20] Section 14.C of the NAIC Model Act and the Comment thereto are available at https://content.naic.org/sites/default/files/model-law-520-life-health-guaranty.pdf at 26, 27 (last visited July 8, 2021).

insurer to the extent of assets attributable to covered policies" that become the responsibility of the guaranty association. 40 P.S. §991.1712(c). However, the extent of assets attributable to covered policies shall be "reduced by any amounts to which the association is entitled as subrogee pursuant to section 1706." 40 P.S. §991.1712(c) (emphasis added).[21] In other words, the association's claim as a creditor goes beyond its subrogation recoveries, which are subtracted from the estate assets received as "attributable to covered policies" to continue coverage for policyholders. Section 1712(c) of the PLHIGA Act, 40 P.S. §991.1712(c).

In sum, Section 536 of Article V together with Section 1712(c) of the PLHIGA Act contemplate that estate assets will be used, first, by guaranty associations to continue coverage after the insolvent insurer's policies are terminated under Section 521 of Article V.

---

[21] Section 1706(m) of the PLHIGA Act provides, in relevant part:

(1) Any person receiving benefits under this article shall be deemed to have assigned the rights under and any causes of action relating to the covered policy or contract to the association to the extent of the benefits received because of this article, whether the benefits are payments of or on account of contractual obligations, continuation of coverage or provision of substitute or alternative coverages. The association may require an assignment to it of such rights and cause of action by any payee, policy or contract owner, beneficiary, insured or annuitant as a condition precedent to the receipt of any rights or benefits conferred by this article upon such person.

(2) The subrogation rights of the association under this subsection shall have the same priority against the assets of the impaired or insolvent insurer as that possessed by the person entitled to receive benefits under this article.

(3) In addition to paragraphs (1) and (2), the association shall have all common law rights of subrogation and any other equitable or legal remedy which would have been available to the impaired or insolvent insurer or holder of a policy or contract with respect to such policy or contracts.

40 P.S. §991.1706(m).

30

The Liquidator's argument that the rights of the guaranty associations are limited to the rights of the policyholders misses the mark for another reason. The guaranty associations' obligations are statutory obligations; they exist independent of the contractual rights established in the policies. *See, e.g.*, Section 1706(c)(1) of the PLHIGA Act, 40 P.S. §991.1706(c)(1) (providing that the guaranty association shall guarantee, assume or reinsure the policies or contracts of an insolvent insurer). Guaranty associations have statutory rights against the estate that are independent of the contractual rights and obligations established in the policies they assume from the insolvent insurer. Article V expressly directs the Liquidator to provide for disbursements to guaranty associations in amounts at least equal to claim payments made or to be made, and if the assets of the insolvent insurer's estate are insufficient, "then disbursements shall be in the amount of available assets." Section 536(c) of Article V, 40 P.S. §221.36(c).

The Liquidator theorizes that notwithstanding the termination of the Companies' policies as of the Termination Date, the Companies remain liable for claims that fall between policy limits and guaranty association limits. In support, the Liquidator directs the Court to several cases that established the principle that policyholders have a right to receive a portion of the estate assets based on the share of the reserves attributable to their policies. *See Commonwealth ex rel. Kirkpatrick*, 29 A. at 660; *In re Integrity Insurance Company*, 685 A.2d at 1286; *In re Executive Life Insurance Company*, 38 Cal. Rptr. 2d at 453; *Commissioner of Insurance*, 50 N.E.2d at 801; *Caminetti*, 142 P.2d at 741.

There are several problems with the Liquidator's reliance on the above precedent, as this Court pointed out in *Consedine*:

31

Except for *Integrity Insurance*, they are ancient.[22] They pre-date any insurer insolvency statute, or at least the modern version developed by the NAIC Model Act, which Pennsylvania has adopted. All concerned policyholders without guaranty fund protection, either because they were exempt from guaranty funds, as in the case of surety bond holders, or because guaranty funds had not yet been invented.

The precedent relied upon by the [Liquidator] establishes that *where there is no guaranty fund protection, it is inequitable to limit a policyholder's claim against an insolvent insurer's estate to a refund of premium*.[]

*Consedine*, 63 A.3d at 445 (emphasis added) (footnote omitted). The above-cited cases arose before the era of insurer insolvency and guaranty association statutes.

At common law, the receiver of an insolvent insurer had few good options. One alternative was to pay policy benefits at some percentage until all policyholder claims were exhausted. This approach would leave estates open indefinitely, at great expense, and it ran contrary to the widely established principle that policies are cancelled upon the appointment of a liquidator for an insolvent insurer.[23] Rejecting this latter alternative, courts distributed estate assets to policyholders on the basis of the reserves established for the policies. This alternative ensured that all assets went to policyholders, not shareholders, but it had shortcomings. It resulted in policyholders receiving cash payments rather than

---

[22] Additionally, *In re Executive Life Insurance Company* was a rehabilitation case and is therefore not relevant to the issues concerning policy termination in liquidation.

[23] Many cases have recited the principle that insurance policies terminated upon the entry of a liquidation order. *See, e.g.*, *State v. Surety Corporation of America*, 162 A. 852, 856 (Del. Ch. 1932); *Boston & A.R. Company v. Mercantile Trust & Deposit Company of Baltimore*, 34 A. 778, 783 (Md. 1896); *Doane v. Millville Mutual Marine & Fire Insurance Company*, 11 A. 739, 743 (N.J. Ch. 1887); *Commonwealth v. Massachusetts Mutual Fire Insurance Company*, 119 Mass. 45, 51 (Mass. 1875); *In re Commercial Insurance Company*, 36 A. 930, 930-31 (R.I. 1897); and *Reliance Lumber Company v. Brown*, 30 N.E. 625, 627 (Ind. App. 1892).

coverage; policyholders that would never have losses received cash payments; and policyholders that had substantial losses received too little in cash payments. Nevertheless, this approach allowed estates to close and policyholders to recover from the insolvent insurer estate.

The guaranty association system solves these problems by providing coverage to policyholders after their policies terminate. This is extremely beneficial in the case of the Companies' policyholders, whose advanced age[24] bars them from purchasing replacement long-term care policies in the voluntary marketplace. Instead, they are guaranteed continued coverage, albeit with limits chosen by their respective states. So long as they continue to pay premiums when due, the Companies' policyholders will receive coverage regardless of when the benefit trigger occurs. It could be decades after the Termination Date. This system will be heavily subsidized by guaranty association member insurers, who will recoup those costs through surcharges upon their policyholders and premium tax offsets. To ensure that the burden on taxpayers and other policyholders is kept to a minimum, the guaranty associations receive early access to estate assets, which are allocated on the basis of the reserves established for the policies transferred to the guaranty associations.

The Liquidator argues that her application to set up a fund or captive to pay extra-guaranty association claims is based upon a view of the insurer insolvency and guaranty association scheme that is shared by "insurance commissioners around the country." Liquidator's Reply Memorandum at 25. That view holds that these statutes have not altered the common law premise that

---

[24] When the Court issued its opinion in *Consedine* in 2012, the average age of PTNA and ANIC policyholders was 77 and 74, respectively. *Consedine*, 63 A.3d at 429.

33

"policyholders are creditors with a claim measured by the value of the policy." *Id.* Even accepting that premise, however, this Court is bound by the terms of Article V, which is the statute that directs the administration of the Companies' estates by virtue of having been domiciled in Pennsylvania.

First, it is a broad leap from the premise that policyholders are entitled to the common law value of their policy to the creation of a captive insurer to pay claims in excess of guaranty association coverage limits.[25] The legislature has provided detailed instructions for the creation and operation of guaranty associations. For example, the PLHIGA Act specifies the mechanisms for continuing coverage for policyholders, Section 1706(c) and (d) of the PLHIGA Act, 40 P.S. §991.1706(c), (d), and assessing member insurers for both administrative costs and the costs of discharging PLHIGA's duties with respect to an insolvent insurer. Section 1707 of the PLHIGA Act, 40 P.S. §991.1707. The legislature has not provided comparable instructions for the Liquidator's use of estate assets to set up an insurance company captive, or trust fund, to provide policyholders with an excess insurance policy, *i.e.*, a policy that provides coverage in excess of what is paid by PLHIGA. It is for the legislature, not this Court, to establish such a novel mechanism and authorize the reallocation of substantial estate assets to effect this mechanism.

Second, the experience from property and casualty insurer insolvencies is not instructive here because the Companies were life insurance companies. In a property and casualty insurer insolvency there is no *opportunity* for continued coverage for policyholders. PPCIGA pays claims, subject to

---

[25] In any case, guaranty association coverage provides for more than a policyholder's proportional share of estate assets. To allocate all the Companies' assets to policyholders would leave them short of the $2 billion that will be provided by guaranty associations.

34

eligibility requirements and benefit limits. But it does not continue the coverage provided by the terminated policy, as does PLHIGA.

This different treatment reflects the fundamental differences in these two kinds of insurance. An annual property and casualty policy is underwritten each year, and the insurer will refuse to renew the policy where it concludes the policyholder no longer presents an acceptable risk. This is not the case with a guaranteed renewable long-term care insurance policy. Consumers are encouraged to buy this insurance while they are young and healthy and able to satisfy a health underwriting examination. When a life or health insurance policy is terminated by a liquidation, the policyholder may not be able to purchase a replacement policy, at any price.

PLHIGA addresses this harsh result by continuing the guaranteed renewable coverage of the policyholders of the Companies for their lifetime. It continues coverage both for policyholders on claim and those who have not yet needed the benefit but who want their risk protection to continue. Because the Companies' long-term care insurance coverage was picked up and continued by guaranty associations, the universe of claims will continue to evolve until all coverage has ended by virtue of the death of the policyholder, the exhaustion of coverage or the lapse of coverage due to non-payment of premium.

By contrast, the universe of claims in a property and casualty insurer insolvency is fixed 30 days after the liquidation order is entered. The claims continue to be reported, but each claim must relate to an insurable event that takes place prior to the termination of the policy under Section 521 of Article V, 40 P.S. §221.21. Claim forms are distributed and must be returned prior to the bar date for claims. This finite universe of claims "permit[s] the Liquidator to manage

35

effectively existing liabilities for the ultimate benefit of all claimants of insolvent insurers," *Warrantech*, 96 A.3d at 358. The Liquidator tallies up all policyholder claims that arose before the Termination Date and apportions assets to each class (b) claim in a like percentage. For example, in the liquidation of Legion Insurance Company, this Court approved a final distribution that paid class (b) claimants "at least 94%" of the amount allowed on their claims by the statutory liquidator. *In Re: Legion Insurance Company (In Liquidation)* (Pa. Cmwlth., No. 1 LEG 2002, order filed February 27, 2019).[26]

Here, the Liquidator did not distribute claim forms to the Companies' policyholders but directed them to contact the guaranty association in their state of residence pursuant to this Court's order. *See In Re: Penn Treaty Network America Insurance Company in Liquidation* (Pa. Cmwlth., No. 1 PEN 2009, order filed March 7, 2017).[27] This is logical because policyholder claims will not be paid by the estate directly but by guaranty associations.

---

[26] The NAIC advises the receiver of an insolvent insurer that "[a] final bar date by which all claims must be presented should be established so that the estate can determine the universe of claims and wind down its affairs over time[.]" RECEIVER'S HANDBOOK FOR INSURANCE COMPANY INSOLVENCIES at 274 (NAIC, 2018 ed.). Regarding the estimation of claims in a property and casualty insolvency, the NAIC advises that "[b]efore a claim may be allowed, the receiver needs timely and accurate evidence … [t]hat the policyholder has, in fact, sustained a loss within the coverage of a valid policy and in a specific or determinable amount." *Id*. at 267. Only after the universe of claims is identified can the liquidator begin the claims process and send proof of claim forms to potential creditors. The NAIC contemplates "claim[s] over the guaranty fund's cap" in a property and casualty insolvency, noting that "anyone with a claim over the guaranty fund's cap, subject to a guaranty fund deductible or subject to a statutory net worth exclusion has a claim against the estate for that portion of the claim not covered by the guaranty fund. … After approval by the receiver, the 'over-cap' claim, as other allowed claims, will be paid as part of a distribution, pursuant to the applicable priority statute." *Id*. at 320. Notably, there is no comparable discussion of "over-cap" claims in the context of a life and health insurer insolvency in the NAIC's Receiver's Handbook.

[27] An identical order was entered for ANIC. *See In Re: American Network Insurance Company in Liquidation* (Pa. Cmwlth., No. 1 ANI 2009, order filed March 7, 2017).

Section 521 of Article V, as construed in *Warrantech*, terminated the the Companies' polices on March 31, 2017. As a consequence, the Liquidator has no liability for claims that arise after that date. It follows, therefore, that the Liquidator may not use the Companies' assets to pay claims that accrue after March 31, 2017.

A comparison of the Insurer Receivership Model Act (IRMA) and Article V is instructive. IRMA provides different termination dates for policies depending on the type of insurance.[28] For property and casualty policies of an

---

[28] Section 502 of IRMA provides, in relevant part, as follows:

B. Notwithstanding any policy or contract language or any other statute, *all policies*, insurance contracts (other than reinsurance by which the insurer has ceded insurance obligations to another person), surety bonds or surety undertakings, *other than life, disability income, long term care or health insurance or annuities*, in effect at the time of issuance of an order of liquidation shall continue in force as provided in this section, unless further extended by the receiver with the approval of the receivership court, until the earlier of:

(1) *Thirty (30) days from the date of entry of the liquidation order*;

(2) The date of expiration of the policy coverage;

(3) The date the insured has replaced the insurance coverage with equivalent insurance with another insurer or otherwise terminated the policy;

(4) The date the liquidator has effected a transfer of the policy obligation pursuant to Section 504A(5); or

(5) *The date proposed by the liquidator and approved by the receivership court to cancel coverage*.

\* \* \*

D. Policies of life, disability income, long term care or health insurance or annuities covered by a guaranty association or portions of such policies covered by one or more guaranty associations, under applicable law, shall continue in force, subject to the terms of the policy (including any terms restructured pursuant to a court-approved rehabilitation plan) to the extent necessary to permit the guaranty associations to discharge their statutory obligations. *Policies of life, disability income, long term care or health insurance or annuities, or portions of*

insolvent insurer, IRMA requires their termination no later than 30 days after the liquidation order, "unless further extended by the receiver with the approval of the receivership court." IRMA §502.B. For long-term care and life and health policies of an insolvent insurer, IRMA provides that they "continue in force … to the extent necessary to permit the guaranty associations to discharge their statutory obligations." IRMA §502.D. IRMA provides another alternative. It states that long-term care policies "not covered by one or more guaranty associations" terminate at 30 days, except to the extent the receivership court approves the use of estate assets to continue "portions of such policies" by "transferring them to an assuming reinsurer." *Id*. Article V does not authorize any of these alternatives.

Until Pennsylvania's legislature adopts the model act in some form, this Court is bound by the inflexible 30-day termination date chosen by the legislature when it enacted Article V. Utterly lacking from Article V is any authority for the Liquidator to send "portions" of the Companies' policies to the Captive or for this Court to approve the use of estate assets to effect such a transfer.

We hold that the Liquidator's proposal to assign policyholders a share of the assets in addition to guaranty association protection lacks support in Article V or the guaranty association statutes. Further, it maintains the feature of the pre-guaranty association system that was the most problematic – allocating assets in a

---

> *such policies, not covered by one or more guaranty associations shall terminate as provided under Subsection B, except to the extent the liquidator proposes and the receivership court approves the use of property of the estate*, consistent with Section 801, for *the purpose of continuing the contracts or coverage by transferring them to an assuming reinsurer*.

IRMA §502 (emphasis added) (available at https://content.naic.org/sites/default/files/inline-files/MDL-555.pdf (last visited June 15, 2021)).

way that does not reflect policyholders' actual losses. And it does so at the expense of the taxpayers and member insurer policyholders that are paying the cost of the new system.[29]

## Conclusion

The Court is mindful of the dislocation suffered by policyholders, creditors and the public when an insurance company is placed into liquidation. The Liquidator seeks to ameliorate this dislocation with the establishment of a fund to pay 10% of claims that exceed guaranty association limits. There is simply no statutory authority for this well-intentioned proposal. Also absent, therefore, is any standard to guide the Liquidator's establishment of the Captive to provide coverage in excess of guaranty association caps or this Court's evaluation thereof. *See Bell Telephone Company of Pennsylvania v. Driscoll*, 21 A.2d 912, 915 (Pa. 1941) (holding a statute without an "explicit standard" to guide the Public Utility Commission in approving contracts between utility affiliates constituted an unconstitutional delegation of legislative power because the commission's "power to approve or disapprove is untrammeled by any conditions….").

A review of the pertinent provisions of Article V and the PLHIGA Act reveals the interlocking nature of the two statutory frameworks and confirms that the system functions simply and sensibly: policyholders who experience a benefit-triggering event, even one that occurs more than 30 days after entry of a

---

[29] The Liquidator's proposal presents a host of issues and questions, beginning with the ability of an insolvent insurer in liquidation to set up a captive insurer. The Liquidator proposes to use the actuarial estimate of the Non-GA Policy Benefits in the aggregate to fund what is effectively an excess insurer that collects no premium, provides uncertain benefits, and burdens the taxpayers and policyholders of solvent companies.

liquidation order, are protected.[30] However, they must look to their guaranty associations for payment order of their claims, not to the estate of the liquidated insurer. Those policyholders have continued coverage solely from the guaranty associations, subject to the guaranty association limits. The guaranty associations use the assets of the insolvent insurer's estate to pay those developing policyholder claims, and then assess their member companies to make up the difference between their respective statutory obligation and what they receive in estate assets. In this case, the difference is approximately $2 billion. The member insurers pass on the cost of the assessments to their policyholders and the taxpayers in states where premium tax offsets are available. The system functions in the way the legislature intended, *i.e.*, to protect insureds against "failure in the performance of contractual obligations" by an insolvent insurer, Section 1701 of the PLHIGA Act, 40 P.S. §991.1701, and to protect "the interests of insureds, creditors, and the public generally" through "equitable apportionment of any unavoidable loss." Section 501.1(b), (c) of Article V, 40 P.S. §221.1(b), (c).

For all of these reasons the Liquidator's Application for Declaration Regarding Policyholder Claims for Non-GA Policy Benefits is denied.

_____
MARY HANNAH LEAVITT, President Judge Emerita

Judge Fizzano Cannon did not participate in the decision in this case.

---

[30] Policyholders on claim when their policy terminates in accordance with Section 521 of Article V have their benefit payments picked up by guaranty associations. For those policyholders, the benefit-triggering event occurred before entry of the liquidation order. Their continued coverage consists of a benefit expectation commensurate with the cap in the applicable guaranty association statute. They will not pay premium to the guaranty association unless they recover and go off claim.

40

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re:  Penn Treaty Network America     :    No. 1 PEN 2009
Insurance Company (In Liquidation)     :

In Re:  American Network Insurance      :    No. 1 ANI 2009
Company (In Liquidation)          :

# **O R D E R**

AND NOW, this 9th day of July, 2021, the Application for Declaration Regarding Policyholder Claims for Non-Guaranty Association Policy Benefits filed by Pennsylvania Insurance Commissioner Jessica K. Altman, in her capacity as Statutory Liquidator of Penn Treaty Network America Insurance Company (In Liquidation) and American Network Insurance Company (In Liquidation) in the above-captioned matter is DENIED.

_____
MARY HANNAH LEAVITT, President Judge Emerita